DAVID M. GLOVER, Judge
Carrie Holdcraft appeals the Pulaski County Circuit Court's termination of her parental rights to her daughter, SH (DOB 5-23-12).[1] She argues it was not in SH's best interest for her parental rights to be terminated. We affirm the termination of Holdcraft's parental rights.
The Arkansas Department of Human Services (DHS) exercised a seventy-two-hour hold on SH on November 3, 2016, after receiving a child-maltreatment report that methamphetamine was within easy reach of SH in Holdcraft's home and alleging Holdcraft was not an adequate caregiver due to her use of drugs. While investigating the report, the DCFS worker observed that Holdcraft appeared to be under the influence of an unknown substance, was fidgety, and was constantly moving. While Holdcraft denied using any illegal substances, she admitted others in the house had done so; the DCFS worker could smell alcohol on Holdcraft, who admitted she had been drinking throughout the day. Holdcraft tested positive for methamphetamine, amphetamines, and marijuana; cocaine and drug paraphernalia were discovered in the house; and a marijuana plant was found growing in the laundry room. Holdcraft was arrested on drug charges, and SH was taken into DHS custody due to neglect and parental unfitness. On November 7, 2016, DHS filed a petition for emergency custody and dependency-neglect; an order granting emergency custody was filed on that same day.
On November 14, a probable-cause hearing was held, and the circuit court entered an order finding that based on the stipulation of the parties, there was probable *558 cause to continue custody of SH with DHS. The circuit court found DHS had made reasonable efforts to prevent removal. At the time of the probable-cause hearing, Holdcraft was incarcerated in the Pulaski County jail. On December 19, an adjudication hearing was held, and the circuit court entered an order finding SH was dependent-neglected. The parties stipulated to the finding of dependency-neglect based on parental unfitness, specifically Holdcraft's drug use, which affected her ability to parent SH. The goal of the case continued to be reunification, with a concurrent goal of adoption, and the circuit court found that DHS had made reasonable efforts to provide services and achieve the goal of the case.
On April 24, 2017, a review hearing was held. The circuit court entered an order finding Holdcraft had made substantial progress since the last hearing by completing her psychological examination; attending outpatient therapy as recommended; participating in therapy; testing negative on all drug screens; visiting SH on a consistent basis; and being employed. The circuit court noted Holdcraft was considering divorcing SH's father, David Holdcraft. The goal of the case remained reunification with Holdcraft. DHS was found to have made reasonable efforts to provide services and achieve the goal of the case.
On October 9, a permanency-planning hearing was held. The circuit court entered an order finding Holdcraft had made no measurable progress and was only paying "lip service" to the case plan. Specifically, evidence was presented that Holdcraft had a positive drug screen on September 27, 2017, for methamphetamine and amphetamines, and she had tested positive for alcohol on August 16. Holdcraft had also been arrested on May 31, 2017, in Saline County for driving while intoxicated; she had her sixteen-year-old son in the car with her at that time. She pleaded guilty to DWI and child endangerment and was placed on probation and fined. The circuit court found Holdcraft had not remained sober, and if she wanted to raise SH, she had to make SH a priority over alcohol and drugs. The goal of the case was changed to adoption and termination of parental rights. DHS was found to have made reasonable efforts to provide services.
On December 5, 2017, DHS filed a petition for termination of parental rights; that petition was voluntarily withdrawn on February 12, 2018, and the hearing was instead converted to a review hearing. In the review-hearing order, the court found the goal of the case was tentative reunification with Holdcraft. It was also found that DHS had made reasonable efforts to provide services. While SH remained in DHS custody, the circuit court found Holdcraft's visitation could be expanded if it did not interfere with SH's therapies and school, and Holdcraft could participate in SH's counseling and therapy as recommended. The circuit court further found Albert Popp, Holdcraft's significant other, could attend visitation but was subject to drug-and-alcohol screens.
On May 2, 2018, a permanency-planning order was filed in which the circuit court changed the case goal to adoption and authorized DHS to file a petition to terminate Holdcraft's parental rights. Holdcraft had tested positive for alcohol on February 28 and March 14, 2018; at the March 21 staffing, Holdcraft appeared to be suffering from withdrawals; she entered detox at Baptist Hospital and was discharged March 23; she entered inpatient treatment on March 26; and after she was released, Holdcraft was able to return to work. The circuit court found Holdcraft had continued to drink throughout the case; she lived with Mr. Popp, who also had a history of alcohol abuse but still worked at a liquor *559 store; they abused alcohol together; Holdcraft had lied and cheated her way through the case and merely checked off boxes without any real change; and although Holdcraft had a bond with SH, her bond with alcohol and addiction was stronger.
On May 21, 2018, DHS filed a second petition to terminate Holdcraft's parental rights alleging three bases applicable to her: (1) SH had been adjudicated dependent-neglected and had continued out of Holdcraft's custody for a period of twelve months, and despite a meaningful effort by DHS to correct the conditions causing removal, the conditions had not been remedied ( Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a ) )(Supp. 2017); (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate placement of SH in Holdcraft's custody is contrary to her health, safety, or welfare and that, despite the offer of appropriate family services, Holdcraft had manifested the incapacity or indifference to remedy the subsequent issues or factors or to rehabilitate the circumstances preventing placement of the juvenile in Holdcraft's custody ( Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a ) ); and (3) SH was subjected to aggravated circumstances ( Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a )(3 )(A ) ).
At the termination hearing, Dr. George DeRoeck, a psychologist, testified Holdcraft suffered from substance abuse of methamphetamine, cannabis, and alcohol, and she had an adjustment disorder with mixed disturbance of emotions and conduct. He believed Holdcraft needed more intensive residential treatment, with the possibility of chemical-free living with SH after treatment. It was his opinion Holdcraft needed to enter a ninety-day program after leaving residential treatment.
Mary Moore, a therapist for substance and chemical dependency, testified she had performed Holdcraft's drug-and-alcohol assessment, and the results of Holdcraft's assessment indicated severe amphetamine-use disorder and cannabis-use disorder. She saw Holdcraft nine times for individual therapy, and Holdcraft attended eighteen group sessions, which constituted a successful completion of Holdcraft's course of treatment. Moore did not know why Holdcraft was not recommended for inpatient treatment, but she recalled Holdcraft was not in a position to attend inpatient treatment.
Jessica Warren, a DHS adoption specialist, testified the data-matching tool indicated 167 adoption resources for SH. She believed SH was an adoptable child, and SH's behavioral issues would not be a barrier to adoption. Warren was aware SH and Holdcraft were bonded and SH did not easily bond with others.
Shanesha Arbor, the family-service worker for SH's case, testified the case had been open for approximately twenty months; the major issues in the case were drugs and alcohol; those addictions prevented SH from returning to Holdcraft's custody; and while Holdcraft had periods of sobriety, there were always relapses or positive tests. Arbor acknowledged Holdcraft had received a number of services from DHS, including a psychological evaluation; individual counseling; a drug-and-alcohol assessment; and parenting instruction, and there were no court-ordered services Holdcraft had not completed. However, Arbor believed Holdcraft's parental rights should be terminated despite completing the services because alcohol and drug issues had been present throughout the case. Arbor explained that while Holdcraft had periods of sobriety, she had also tested positive for alcohol, methamphetamine, and amphetamines throughout the *560 case, including shortly after completing outpatient substance-abuse treatment.
Arbor also testified Holdcraft had arrived at the March 21, 2018 staffing with shakes and tremors; Holdcraft said she was having withdrawals; was admitted into a detox program; and entered an inpatient facility. Arbor said while Holdcraft now stated she was sober after completing inpatient treatment, Arbor was still unsure if Holdcraft's addictions were under control because while Holdcraft claimed to be sober during the case, she was lying and hiding her relapses. Arbor noted Holdcraft was arrested for DWI during the same time she was asserting she was sober. Arbor also related that on one occasion, she could smell alcohol on Holdcraft; when she attempted to test Holdcraft, Holdcraft prevented the swab from coming into contact with her saliva; when the test was properly performed, Holdcraft tested positive for alcohol. It was Arbor's opinion Holdcraft was not credible about her sobriety, and Arbor did not believe SH could be safely returned to Holdcraft due to Holdcraft's history and limited period of sobriety. Arbor also expressed concerns about Holdcraft being romantically involved with a man who has his own drug and alcohol issues.
On cross-examination, Arbor admitted Holdcraft's home was clean and appropriate; Holdcraft and Popp had been living together for a period of time without any police intervention; and Holdcraft had maintained her job for a year, had received a raise, and had completed all the services ordered for her. Arbor also noted Holdcraft was participating in SH's counseling, she was learning how to deal with SH's issues and behavior, and SH and Holdcraft had a good relationship.
Holdcraft testified she intended to divorce David Holdcraft but did not know where he was living and was saving money to obtain the divorce. She said her date of sobriety was March 21, 2018; she had a sponsor; she was on the fourth step of her twelve-step program; the inpatient treatment gave her more one-on-one counseling; and the inpatient treatment provided her the tools she needed to live a sober life. She acknowledged her relationship with Albert Popp, and she admitted they were both in recovery. Holdcraft believed it was in SH's best interest for custody to be returned to her.
On cross-examination, Holdcraft stated she had completed two rounds of alcohol-and-drug therapy through Recovery Centers of Arkansas; the inpatient treatment was more intensive than outpatient treatment; and she was attending twelve-step meetings five times a week. After first testifying that she did not recall asking about inpatient treatment after she completed her outpatient services, Holdcraft then stated she remembered inpatient treatment was approved on October 20, 2017, but she declined the inpatient treatment because she did not want to lose her job. She testified the inpatient services worked for her, and she was through with drugs and alcohol; however, she admitted she had lied both to Arbor and to the circuit court during the pendency of her case, noting she had received a DWI with another one of her children in the car with her. Holdcraft explained that if she began drinking she would call her sponsor and have her sister take SH; however, she admitted she had not discussed this plan with her sister. Holdcraft asserted that while she and Popp had a history of using drugs together, she was now sober; she also saw no problem with Popp being employed at a liquor store while attempting to remain sober. She emphasized she had been sober for four months, which was the length of time she had been out of inpatient treatment.
*561 In closing, DHS argued Holdcraft's claims of sobriety could not be believed because she had lied about her sobriety throughout the case, and eleventh-hour efforts were not enough to prevent termination of her parental rights. Holdcraft argued she had been sober for four months; she had a bond with SH, who had difficulty bonding with people; she had a stable home, job, and relationship; and while she had some relapses, she was now ready to take care of SH.
The circuit court terminated her parental rights on all three bases pled by DHS, finding the termination was in SH's best interest. A termination order was entered on August 22, 2018.
Standard of Review
Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children. Griffin v. Arkansas Dep't of Human Servs. , 2017 Ark. App. 635, 2017 WL 5762415. The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the juveniles will be adopted and of the potential harm caused by returning custody to the parent. Id. Each of these requires proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. Id.
We review termination-of-parental-rights cases de novo, but we will not reverse the circuit court's ruling unless its findings are clearly erroneous. Gonzalez v. Arkansas Dep't of Human Servs. , 2018 Ark. App. 425, 555 S.W.3d 915. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. Id.
Argument
Holdcraft makes no argument regarding any of the grounds relied on by the circuit court for termination. She has therefore abandoned any sufficiency argument pertaining to the statutory grounds used to terminate her parental rights. Holdcraft's sole argument is termination of her parental rights was not in SH's best interest. We disagree.
A best-interest finding must be based on the circuit court's consideration of at least two factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact with the parent. Baxter v. Arkansas Dep't of Human Servs. , 2017 Ark. App. 508, 2017 WL 4399676. It is the overall evidence-not proof of each factor-that must demonstrate termination is in the child's best interest. Id.
Adoption specialist Jessica Warren testified at the termination hearing that SH was an adoptable child and there were numerous potential adoption matches; this testimony was unrebutted. Holdcraft makes no argument SH is not adoptable. Her argument focuses on the potential-harm prong. A potential-harm analysis must be conducted in broad terms, with the circuit court considering the harm to the children's health and safety that might occur from continued contact with the parent. Barnes v. Arkansas Dep't of Human Servs. , 2017 Ark. App. 525, 2017 WL 4666814. There is no requirement to *562 find actual harm would result or to identify the potential harm. Id.
Holdcraft readily admits the primary impediment in her case has been her drug addiction, but she points to her new-found sobriety of four months as a testament to her stability, as opposed to an eleventh-hour effort to prevent termination of her parental rights. She faults DHS for her failure to obtain lasting sobriety earlier, arguing DHS failed to ensure she received appropriate services-specifically, inpatient treatment-for her addiction. This is untrue. By Holdcraft's own admission in her testimony at the termination hearing, DHS approved inpatient treatment for her in October 2017-nine months prior to the termination hearing-but she made a conscious decision not to take that opportunity at that time. Therefore, her argument blaming DHS for her late-found sobriety rings hollow. Additionally, DHS was found to have provided appropriate services throughout the pendency of the case. Nevertheless, whether DHS provided or failed to provide a service has no bearing on whether SH would suffer potential harm if returned to Holdcraft, as DHS is not required to provide any services under the potential-harm analysis.
Holdcraft, citing Prows v. Arkansas Department of Human Services , 102 Ark. App. 205, 283 S.W.3d 637 (2008), argues that even though her sobriety was only for a period of four months, the circuit court was required to consider her improvement and weigh it in relation to all the other evidence of improvement. The circuit court did consider Holdcraft's periods of sobriety in making its determination to terminate her parental rights. It is true Holdcraft had stable employment and an appropriate home for SH. However, the case was open for approximately twenty months prior to termination of Holdcraft's parental rights. During that time, Holdcraft had periods of sobriety, but she also had periods during which she lied to the circuit court about her sobriety, she tested positive for alcohol and illegal drugs, and she was even arrested for driving while intoxicated with her teenage son in the vehicle with her. DHS voluntarily withdrew the first termination petition it filed in December 2017 due to her progress in the case, but Holdcraft continued to drink and arrived at a staffing in the throes of withdrawal, necessitating entry into a detox program. In determining potential harm, the circuit court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. Scott v. Arkansas Dep't of Human Servs. , 2018 Ark. App. 347, 552 S.W.3d 463. Holdcraft was unable to maintain her sobriety for an extended period of time, and the circuit court did not find her testimony that she was now sober and would remain so to be credible.
Furthermore, Holdcraft's argument that she was bonded to SH and that SH did not bond well with other people cannot prevent the termination of her parental rights. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. Id. The circuit court's determination that SH would suffer potential harm if returned to Holdcraft's custody was not clearly erroneous; we affirm the termination of Holdcraft's parental rights.
Affirmed.
Harrison and Klappenbach, JJ., agree.

The parental rights of David Holdcraft, SH's father, were also terminated in this order; however, he is not a party to this appeal.