Cite as 2021 Ark. App. 62

# ARKANSAS COURT OF APPEALS

DIVISION IV

**No.** CV-20-564

| | |
|---|---|
| SARAH MCCLOUD | **Opinion Delivered:** February 10, 2021 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION [NO. 60JV-2019-839] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | HONORABLE WILEY A. BRANTON, JR., JUDGE |
| APPELLEES | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Sarah McCloud appeals from the July 1, 2020 order of the Pulaski County Circuit Court terminating her parental rights to her children, G.G. and D.M.[1]  McCloud's sole point on appeal is a challenge to the sufficiency of the evidence supporting the circuit court's finding of potential harm.  We affirm.

### I. *Factual Background*

On April 3, 2019, the Arkansas Department of Human Services (DHS) took emergency custody of one-year-old D.M. and one-month-old G.G. due to allegations of neglect, parental unfitness, and drug use.  One month prior to the children's removal, DHS

---

[1]The parental rights of G.G.'s father, Chian Gibson, were also terminated; he is not a party to this appeal.  The termination order also found that D.M.'s putative father's parental rights had not attached due to his lack of significant contacts.  Accordingly, this appeal pertains only to Ms. McCloud.

received a report that McCloud and G.G. tested positive for illegal substances at the time of G.G.'s birth. While investigating the report, the family service worker (FSW) met with McCloud to explain the allegations of drug use to her, and McCloud admitted regularly smoking marijuana during her pregnancy with G.G. G.G. was born prematurely and spent the first six weeks of his life at Arkansas Children's Hospital (ACH).

During G.G.'s hospitalization, DHS attempted to provide services to McCloud. In a March 20 team meeting with the FSW and the ACH social worker, McCloud's aunt, Kawana McCloud, agreed that D.M. and McCloud—as well as G.G. when he was released—could come live with her in Little Rock. McCloud had minimal contact with G.G. during this time and did not demonstrate sufficient comprehension of G.G.'s medical needs. On March 26, Kawana contacted the FSW and said McCloud would not be able to live with her now because they had an argument. Kawana told the FSW that she would be amenable to becoming a provisional placement for the children but only if McCloud did not live there. On March 29, the FSW received notice that G.G. would be released from ACH on April 1. Before G.G. could be discharged, the caretaker was required to room with G.G. for forty-eight hours to learn how to properly care for him. Both McCloud and Kawana, along with two family service workers, agreed to room with G.G. On April 1, the children were placed in DHS custody and placed with Kawana because McCloud did not understand G.G.'s medical needs, care, or development and lacked adequate housing. It was also noted that McCloud believed that THC was good for G.G. and was making him strong.

2

On April 3, 2019, DHS filed a petition for emergency custody and dependency-neglect with the Garland County Circuit Court; an ex parte order for emergency custody was filed the same day.

On April 10, 2019, a probable-cause hearing was held, and the circuit court entered an order finding that on the stipulation of the mother, there was probable cause to continue custody of D.M. and G.G. with DHS. The circuit court found that DHS was deemed to have made reasonable efforts to prevent removal. On May 22, an adjudication hearing was held, and the circuit court entered an order finding D.M. and G.G. dependent-neglected. The parties stipulated to the finding of dependency-neglect based on neglect and parental unfitness; specifically, McCloud and children were homeless, and G.G. was born premature and both McCloud and G.G. tested positive for illegal substances at the time of birth. The goal of the case was reunification with a concurrent goal of permanent guardianship, permanent relative placement, or adoption. The circuit court found that DHS had made reasonable efforts to provide services and achieve the goal of the case.

On July 8, 2019, this case was transferred from the Garland County Circuit Court to the Pulaski County Circuit Court due to McCloud's relocation to Little Rock. A review hearing was held on September 25, 2019. The circuit court entered an order finding McCloud had made some effort to comply with her case plan—she had visited with the children, submitted to a psychological evaluation, submitted to drug-and-alcohol assessment, and participated in drug screens. The circuit court noted that "no material progress" had been made citing that McCloud was currently without housing (she had slept in her car the night before) and appeared very emotionally unstable and low functioning

3

with a flat demeanor at the hearing. The goal of the case remained reunification with McCloud with a concurrent goal of a relative placement. DHS was found to have made reasonable efforts to provide services and achieve the goal of the case.

In a permanency-planning order filed on May 26, 2020 (hearing was held February 4, 2020), the circuit court changed the goal of the case to adoption and authorized DHS to file a petition to terminate McCloud's parental rights but ordered that services remain offered to her. The circuit court found that McCloud had failed to make material progress toward the goal of reunification. The circuit court noted that McCloud's drug screens had all been negative; however, it was unclear whether McCloud was taking her prescription for lamotrigine. McCloud had obtained housing on September 19, 2019, but was not gainfully employed—she stated she received $60 for taking care of an individual the preceding Friday, had an interview scheduled with Carelink, and was briefly employed by Popeye's but was fired due to an altercation with a work peer. In addition, McCloud was detained by law enforcement on Christmas Eve. She explained to the circuit court that she had gone outside to smoke, had asked a stranger for a cigarette, and had gotten into a car with other strangers, which was subsequently raided by law enforcement where contraband, including weapons, was found. McCloud's explanation for this incident was simply being at the wrong place at the wrong time. The circuit court found McCloud's testimony regarding her taking prescription medicine confusing and illogical. McCloud insisted that she was medication compliant but admitted at a staffing that she was not taking her medication. She was observed bringing junk food to visits with the children and chewing food and then feeding it to G.G. G.G. has respiratory issues and uses an inhaler, and the

4

children would return smelling of smoke after the visits concluded. The circuit court found that McCloud needed to demonstrate mental health and stability as well as be medication compliant.

DHS filed a petition for termination of parental rights on March 31, 2020, alleging the following grounds: (1) D.M. and G.G. had been adjudicated dependent-neglected and continued out of McCloud's custody for a period of twelve months and despite a meaningful effort by DHS to correct the conditions causing removal, the conditions had not been remedied under Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2019); (2) other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate placement in McCloud's custody is contrary to the children's health, safety, or welfare and that, despite the offer of appropriate family services, McCloud had manifested the incapacity or indifference to remedy the subsequent issues or factors or to rehabilitate the circumstances preventing placement of the juveniles in McCloud's custody under Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; and (3) G.G. and D.M. were subjected to aggravated circumstances under Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*.

At the termination hearing, Angela Brown, a DHS adoption specialist, testified that the data-matching tool indicated 179 possible families that would be interested in adopting G.G. and D.M. based on their race and medical conditions. It was her opinion that the children are adoptable as a sibling unit.

The next witness was Dr. George DeRoeck, forensic psychologist, who testified that he performed a psychological examination of McCloud on July 3, 2019. Dr. DeRoeck's report indicated an alternate placement may be indicated due to McCloud's low intellectual

5

development, high potential for substance abuse, and posttraumatic stress symptoms that would interfere with her overall judgment and reasoning. He testified that he had concerns regarding McCloud's marijuana usage and her judgment issues and history of posttraumatic stress that he felt would interfere with her ability to provide a safe setting for the two children. He testified that he believed McCloud's overall prognosis to independently parent at this point to be poor. He explained that McCloud had a tendency to minimize her use of marijuana during her pregnancy with G.G. and that she viewed marijuana as medicine and intimated that she would continue to use it.

Breanna Earnest, the FSW for G.G. and D.M.'s case, testified that she had been assigned this case in July of 2019. The major issues in the case were McCloud's failure to complete the recommended drug-and-alcohol treatment from her drug-and-alcohol assessment, failure to obtain a second drug-and-alcohol assessment when asked after failing to attend treatment, and her lack of employment. Earnest acknowledged that McCloud had obtained stable housing as ordered. Earnest testified that McCloud had a positive drug screen for THC on February 27, 2020, which was followed by several negative drug screens. Earnest said that McCloud had still not found employment and, to her knowledge, had no source of current income. Earnest had concerns about McCloud's mental health in light of their interactions. She said they spoke many times about the importance of stabilizing her mental health and of McCloud's taking her prescribed medication. McCloud would tell Earnest that she did not need medication one day but then would say she did need medication the next time.

Earnest testified that she helped McCloud apply for Medicaid so that she could get a primary-care physician referral for counseling, but McCloud did not follow through with any therapist. Earnest said that she had recently learned that McCloud had a new boyfriend and was pregnant with another baby.

Earnest testified that both children were doing very well and making a lot of progress. Both attended the Allen School where they were receiving therapies for developmental delays, and there were no medical issues with either child. Earnest believed that termination was in the children's best interest. She would be concerned for the children's safety if returned to McCloud due to her lack of judgment and inability to support herself. On cross-examination, Earnest stated that the children were doing well in Kawana's care. She believed that Kawana was interested in adoption rather than a guardianship. Earnest admitted that McCloud did obtain stable housing but that it was not feasible for her and her two children because it was a small studio apartment. Earnest stated that visits between the children and McCloud were okay; however, McCloud did not like to receive feedback on how to care for the children. Earnest said that she helped McCloud apply for disability benefits and that the application was still pending.

McCloud testified that she was living by herself in Cumberland Towers. She did have a boyfriend, who did not live with her, and was currently eight weeks pregnant. McCloud was not currently working due to the Coronavirus. She stated that the last job she had was "sometime" last year at Popeyes and she was fired. McCloud explained that she worked "under the table" taking care of elderly people and taking them where they need to go. McCloud stated that she now has a vehicle but does not have a driver's license.

She acknowledged that it is illegal to drive without a valid driver's license and that she had been "filling out applications." She was trying to obtain Social Security benefits but said she was denied because she does not have a disability. McCloud stated that there is nothing wrong with her. She admitted taking lithium but does not believe she needs therapy.

On cross-examination, McCloud testified that she is in a position to bring home her children. She said that she had to stop taking her medicine because she is pregnant and that she has a split personality. She said that her visits with G.G. and D.M. were going great. McCloud testified that she had learned a lot in parenting classes through DHS. She stated that her children were taken into care due to her marijuana use and lack of housing. She said that she would move to a bigger apartment if her children were returned. She believed that she had done everything possible to get her children back and that they would be safe in her care.

The circuit court questioned McCloud about her prescription for lithium and her understanding of her mental-health diagnosis — she said she has a split personality and that the last time she saw a psychiatrist was before her case began. She stated that she did see someone for medication purposes in November 2019. McCloud was asked about her current boyfriend and her living situation. She again explained when she was detained by law enforcement on Christmas Eve after getting into a stranger's car.

Kawana McCloud was the final witness. She testified that she is McCloud's aunt and had been G.G. and D.M.'s foster parent since the beginning of the case. Kawana explained that she spent one week with G.G. after he was born at the hospital and learned how to care for him due to his respiratory problems. She said that G.G. was doing great. He has

to use an asthma pump and has a speech delay. Kawana said that he is developmentally delayed due to being premature but was receiving cognitive, speech, and physical therapy. D.M. received speech and cognitive therapy. Kawana called McCloud every week for visits, but they did not have a set schedule. Due to the coronavirus, the visits had been occurring over Facetime. Kawana stated that sometimes the children were not attentive, and McCloud would watch them play. Kawana said that McCloud would sometimes make herself available for the visits but was not always reachable. McCloud would be in her car for most of the Facetime calls and was in a hotel on a couple of calls. Kawana was concerned about the children returning to McCloud because she did not believe she was stable and was afraid the children would not receive proper care. Kawana testified that she wants to adopt the children. She stated that she loves her niece, but she did not want to be just a guardian of the children and mandated to interact with McCloud because it was hard to communicate with her on a mature level.

After the hearing on the termination petition, the circuit court found it was in G.G.'s and D.M.'s best interest for McCloud's parental rights to be terminated and granted the termination on all three bases pleaded by DHS as to McCloud in the petition to terminate parental rights. A termination order to that effect was entered on July 1, 2020. McCloud now appeals the termination order.

## II. *Standard of Review*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the children. *Holdcraft v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 151, 573 S.W.3d 555. The first step requires

proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the children will be adopted and of the potential harm caused by returning custody to the parent. *Id.* Each of these require proof by clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Id.*

This court reviews termination-of-parental-rights cases de novo, but we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Johnson v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 313, 603 S.W.3d 630. A finding is clearly erroneous when, although, there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, we have noted that in matters involving young children, we will give great weight to the circuit judge's personal observations. *Holdcraft*, 2019 Ark. App. 151, at 9, 573 S.W.3d at 561.

III. *Argument*

McCloud's sole argument on appeal is that the termination of her parental rights was not in G.G.'s and D.M.'s best interest. A best-interest finding must be based on the circuit court's consideration of at least two factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by the continuing contact with the parent. *Jackson v. Ark. Dep't Human Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122. It is the overall evidence—not proof of each factor—that must demonstrate termination is in the child's best interest.

10

Adoption specialist Angela Brown testified at the termination hearing that G.G. and D.M. are adoptable and stated that there were 179 potential adoption matches for them. The testimony was unrebutted, and McCloud makes no argument on appeal that G.G. and D.M. are not adoptable. Thus, we need not consider that issue. *Wheeler v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 453, 607 S.W.3d 536.

Rather, McCloud's argument focuses on the potential-harm prong of the best-interest element. A potential-harm analysis must be conducted in broad terms, with the circuit court considering harm to the children's health and safety that might occur from continued contact with the parent. *Hollinger v. Ark. Dep't Human Servs.*, 2017 Ark. App. 458, 529 S.W. 3d 242. There is no requirement to find actual harm would result or to identify the potential harm. *Id.* Additionally, evidence of a parent's drug use or failure to comply with court orders constitutes sufficient evidence of potential harm. *Johnson*, 2020 Ark. App. 313, 603 S.W.3d 630.

We find no error in the circuit court's potential-harm finding. McCloud was ordered by the court to submit to a drug-and-alcohol assessment and follow any recommendations, to obtain and maintain employment, to refrain from the use of illegal drugs and alcohol, to submit to weekly drug screens, to attend individual counseling and domestic-abuse counseling, to demonstrate the ability to properly care for the children and meet their health and safety needs, and to demonstrate mental health stability and medication compliance. She did not comply with these orders. While McCloud did submit to a drug-and-alcohol assessment in the beginning of the case, she did not follow the recommended drug treatment. She tested positive for THC in March 2020 and refused to submit to a drug

screen one week prior to the termination hearing. She failed to attend counseling as ordered.

Furthermore, FSW Breanna Earnest testified that she had concerns about McCloud's mental health and that she had been inconsistent in getting therapy and taking prescribed medication. Earnest testified that McCloud lied to her about attending individual counseling. McCloud testified that she did not need therapy and was fine without it. In addition, her testimony regarding taking her medication was very inconsistent. However, Dr. DeRoeck testified about McCloud's psychological evaluation and stated he believed the overall prognosis regarding McCloud's ability to parent was poor. Dr. DeRoeck cited several reasons for his concerns, including her drug use, history of posttraumatic stress, and judgment issues.

Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Scott v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 347, 552 S.W.3d 463.

McCloud briefly argues that she should be given more time "in light of the restrictions in getting services in the months preceding the termination hearing due to the coronavirus pandemic." This argument was not raised below, thus she is barred from raising it for the first time on appeal. *Langston v. Ark. Dep't of Human Servs.*, 2019 Ark. 152, 574 S.W.3d 138. This argument would fail even if it was not barred because the circuit court in this case specifically addressed the effect of the pandemic and found that the coronavirus did not have a negative impact on the outcome of this case. Moreover, the goal of this case was changed to adoption at the permanency-planning hearing, which was held February 4,

2020, more than one month prior to the coronavirus shutdowns. As such, appellant's behaviors over the course of the entire case as outlined above do not show enough stability to render the circuit court's finding that appellant posed a risk of potential harm to G.G. and D.M. clearly erroneous. Accordingly, we affirm the order terminating appellant's parental rights.

Affirmed.

HARRISON, C.J., and KLAPPENBACH, J., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Callie Corbyn*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.