Cite as 2025 Ark. App. 559

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-25-411

| | |
|---|---|
| KIMBERLY BRAHLER BARNES<br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILD<br>APPELLEES | Opinion Delivered November 19, 2025<br><br>APPEAL FROM THE LOGAN<br>COUNTY CIRCUIT COURT,<br>SOUTHERN DISTRICT<br>[NO. 42BJV-23-25]<br><br>HONORABLE TERRY SULLIVAN,<br>JUDGE<br><br>AFFIRMED |

**ROBERT J. GLADWIN, Judge**

This is an appeal from the April 17, 2025 order of the Logan County Circuit Court terminating the parental rights of Kimberly Brahler Barnes to her daughter ("MC").[1] Kimberly challenges the sufficiency of the evidence supporting the circuit court's specific findings regarding the three statutory grounds and the best-interest analysis. We affirm.

I. *Facts and Procedural History*

The case originated on September 22, 2023, when the Arkansas Department of Human Services ("DHS") exercised emergency custody of MC due to abandonment, abuse, neglect, and parental unfitness. Specifically, DHS placed a hold on MC after her legal

---

[1]MC's date of birth is May 1, 2009. Kimberly is MC's biological mother, and her biological father is Jefferson Springer, who was reported deceased at the start of the case.

guardian (maternal aunt Pamela Keeter) refused to pick her up from an acute stay following a violent incident between MC, Pamela, and Pamela's daughter.[2] MC's guardianship was established in 2017 through a voluntary placement by Kimberly during a time when Kimberly was addressing domestic-violence concerns in her home concerning MC's safety.[3]

On September 25, DHS filed a petition for dependency-neglect and emergency custody of MC pursuant to Arkansas Code Annotated section 9-27-303 (Supp. 2023), and on the next day, the circuit court entered an ex parte order for emergency custody. On September 28, the court filed a probable-cause order wherein it found that probable cause existed for the emergency order to remain in place and warranted MC's placement in foster care pending further hearings. The court also found that there should be no contact between MC and Kimberly. Additionally, the court ordered Kimberly submit to a psychological evaluation.

On October 11, Pamela filed a petition in the juvenile court to dissolve the guardianship that had been put into place on June 5, 2017, because MC's custody had been

---

[2]On September 8, a referral was made to the hotline for allegations of choking and bruising injuries to MC that had occurred in Pamela's home. The report stated that Pamela's older daughter had choked MC and given her two black eyes and that Pamela had been "mean" to MC, slapping her in the face with an open hand. The police responded, and MC was first placed with her uncle before voluntarily entering a youth shelter. When MC wanted to leave the shelter a couple of weeks later, Pamela would not answer DHS's messages and refused all responsibility for MC.

[3]The record shows that Kimberly and MC were at continual risk of harm from Springer before his death in 2019, which prompted MC's placement with Pamela.

placed with DHS, and there were ongoing efforts to reunify MC with Kimberly (despite the no-contact order obtained by Pamela remaining in effect).

On November 7, the circuit court held an adjudication hearing and made a dependency-neglect finding based on dependency. The court also ordered that the case goal be reunification. Additionally, it ordered Kimberly to follow the case plan and orders of the court—specifically, to submit to a psychological evaluation; participate in individual and family counseling; submit to random drug screens; obtain and maintain appropriate housing and transportation; complete parenting classes; and watch the video *The Clock is Ticking*. Further, the court modified the no-contact order between Kimberly and MC to allow contact if strictly supervised by DHS and dismissed Pamela from the case.

On November 27, Kimberly filed an affidavit stating that (1) DHS had the results of her psychological evaluation; (2) she was stable; (3) her housing was deemed appropriate by DHS—a house she had maintained for at least four years; (4) she had a reliable and insured vehicle; (5) she did not contribute to MC's removal; (6) she had yet to visit with MC; and (7) her rights were being violated because there had been no finding of unfitness made or evidence presented that would support a finding of unfitness. She requested the return of custody of MC and for the case to be closed. DHS responded, citing the guardianship orders placed by the juvenile division and alleging that those orders had found Kimberly to be unfit when they were entered six years earlier.

On December 11, Kimberly filed another petition seeking to modify custody and close the case. She included a lengthy explanation of the history of the guardianship and

provided a list of case numbers and dispositions that had been resolved in her favor along with her efforts to obtain custody of MC after DHS had become involved. In her efforts to refute DHS's misunderstanding of her legal history and its position that she was unfit, Kimberly included documentary evidence supporting her claims as well as a handwritten note from MC in which MC stated that nobody had talked to her about her wishes when she was placed in foster care and that she "desperately" wanted to go home to her mother. Notably, Kimberly provided the results of the psychological evaluation she had undergone after MC's placement in foster care that was absent of any findings contrary to healthy parenting.

On February 6, 2024, the circuit court held a first review hearing and noted in the subsequently entered order that the hearing was "very contentious." The court ordered that the case plan goal remain reunification and that MC remain in the custody of DHS. The court also found that Kimberly was not credible in her testimony; had not cooperated with DHS and her counselor; and had provided MC with clothes that included a vape. Additionally, the court ordered no contact between Kimberly and MC unless it was supervised by DHS. The court ordered her to "get with the program" and "work with her counselor and DHS on her services."

On August 6, the court held a second review hearing in which it continued the goal of reunification and ordered that MC remain in DHS's custody. The court found that Kimberly's drug-screen results were "troubling," even though the order contained no indication as to the results. The court noted that it had entered into evidence a multitude of

4

guidance-center records as well as random drug screens but made no mention of any positive results, just a failure to produce a urine sample that day. The court further noted a text message between Kimberly and MC regarding a "funeral," and characterized the message as "not appropriate parenting."[4] The court stated that if there were any more inappropriate text messages, DHS could stop further visitation. The court recognized that MC is "happy where she is" and continued to require strict supervision during visits.

On October 15, the court attempted to hold a third review hearing; however, because Kimberly was ill, it was cut short, and the court ordered the parties to facilitation—similar to mediation. In its resulting order, the court ordered the goal to remain reunification but stated that DHS could file a petition to terminate parental rights ("TPR") at any time and ordered MC to remain in DHS's custody. The court specifically found Kimberly to be "unfit," although the order did not provide any evidentiary support.

On January 7, 2025, before the facilitation meeting, the court held a permanency-planning and fifteen-month review hearing. At this hearing, the court changed the goal to adoption following TPR and ordered that MC remain in DHS's custody. The court also found Kimberly noncompliant with the case plan and that she did not have an appropriate home—that it was about to collapse and was no longer safe to live in; that she had not

---

[4]The text, as Kimberly later described it, was sent by Kimberly thirty minutes after she came out of surgery and stated that she was in the hospital, that she may die, and that MC might have to attend her funeral. Kimberly later apologized to MC for the text, explaining to her that she had just come out of surgery, implying that she was under the influence of anesthesia.

complied with more than twenty drug screens; that she owed over $6,000 in fines; and that she was not exercising her visitation with MC. The court ordered DHS to continue with services but noted that Kimberly might not be receptive.

On January 23, one day before the scheduled facilitation meeting, DHS filed a termination-of-parental-rights (TPR) petition alleging that Kimberly had been noncompliant with the case-plan services; had failed to attend counseling with MC and had canceled several family visits that left their relationship strained; and had exhibited poor parenting because she wrote a note to MC during one visit that said, "[I]f you do not talk to me, DHS is going to stop our visits." DHS alleged that Kimberly was unfit and that TPR was in MC's best interest.

On January 24, the facilitation meeting took place. The facilitation notes stated that (a) Kimberly had appropriate housing—she was temporarily out of the home while a major roof and soffit repair was being made; (b) her counseling (both individual and family) was inconsistent because the therapists were inconsistent—the first therapist no longer accepted Kimberly's insurance, the second therapist (whom Kimberly sought out on her own) was rejected by DHS because he was not contracted with DHS insurance, and the third therapist canceled sessions (ultimately, Kimberly was "let go" by the counseling agency, as noted in the DHS report submitted for the TPR hearing); and (c) family time had not been taking place since DHS moved it from Mondays to Tuesdays, which interfered with Kimberly's work schedule, but DHS noted it would be moved back to Mondays. The notes stated that the caseworker, Sandra Anderson, would work to resolve the contractor/provider issues and that

Kimberly would resolve DHS's inability to perform random drug screens. Kimberly submitted to a ninety-day hair-follicle drug screen on March 14, and it was negative for all substances. DHS nevertheless went forward with the scheduled TPR hearing.

On April 1, the court held a hearing on the TPR petition. First to testify was the caseworker, Sandra Anderson. She described Kimberly's compliance throughout the case as "very difficult," saying she would "sometimes" cooperate and then "sometimes not." There had been very little communication for the four months leading up to the hearing, and the last visit between Kimberly and MC was November 19, 2024. Anderson noted that Kimberly attended some counseling in February 2024, followed by a string of random "no-shows" through June 2024 and "minimal counseling" since that time. Anderson said she had attempted to visit Kimberly in February 2025; however, Kimberly told her at the door of her home that she was "done with this" and that she would see Anderson in court.

Anderson also recounted an attempted drug screen after the March 2025 hearing in which Kimberly produced a urine sample that would not register a temperature and was therefore deemed invalid. She noted that Kimberly told her to "get away from her" and would not allow her to observe the urine-sample collection in the restroom. Anderson testified that Kimberly had "40 failed [drug-screen] attempts out of an 18-month period" and further said that she had attempted to contact Kimberly multiple times in 2024 and 2025. Anderson asserted that Kimberly would also not provide a current address after informing Anderson that she was moving to Fort Smith. Anderson opined that TPR was appropriate

because MC could find permanency through adoption, and despite its attempts to assist Kimberly, "it's been difficult."

On cross-examination, Anderson acknowledged that Kimberly's move to Fort Smith was for only one month and that Kimberly had informed her on December 30, 2024, that she would be moving to Fort Smith due to a necessary ceiling repair at her permanent residence. She acknowledged that Kimberly had let her know on February 3, 2025, that she had repaired the ceiling and had moved back into the home. Anderson further noted that throughout the case, Kimberly had stable and appropriate housing, although she characterized her temporary move to Fort Smith as an exception to that stability.

Anderson acknowledged that Kimberly, being on disability, has stable income and that she also had completed parenting classes. She further noted that while there were approximately forty failed attempted drug screens, most of those were attempted in February during her temporary move to Fort Smith and after her supervisor had told her to be more diligent in her efforts as DHS prepared for TPR.

Anderson specified that Kimberly's cooperation with the remainder of the case plan dwindled after November 2024—she had not completed a multitude of services, nor had she visited with MC. She opined that, while Kimberly had "somewhat" demonstrated the parenting skills learned in parenting classes, she had also shown inappropriate parenting, citing the previously described note and text. Anderson acknowledged that Kimberly had apologized to MC for that text.

MC testified that she had not lived with her mother since she was seven, that she did not want to live with her because she felt unsafe with her, and that she wanted her foster parents to adopt her. However, she acknowledged that before November 2024, just five months before the TPR hearing, she had wanted to live with her mother. She said she changed her mind after learning in the January 2025 facilitation meeting that her mother had, at some point during the case, tested positive for methamphetamine. She said nothing could change her mind and had no comment regarding her therapist's opinion that she had poor decision-making skills and did not tell the truth all the time.

Kimberly also testified and introduced numerous exhibits, including some that refuted Anderson's testimony. These included her negative hair-follicle test from March 2025, photos of her home, a parenting-class certificate, attendance sheets for completed counseling appointments from July 2024 to January 2025, a printout from her Mercy Health dashboard of her sick visits and surgeries during the case, a call and text log printout from AT&T showing communications with Anderson, and a log of missed visits between Kimberly and MC encompassing nearly every weekly visit from August 6 to October 8, 2024, with DHS stating that MC did not feel well.

The circuit court entered an order on April 17, 2025, terminating Kimberly's parental rights, finding that she was unfit because she had failed to remedy the issues that prevented placement of MC in her home, she failed to remedy issues that arose subsequent to the filing of the initial petition, and aggravated circumstances existed because there was little likelihood that services would result in reunification. The court cited specific evidence that

supported the three statutory grounds collectively and further found that TPR was in MC's best interest because she would likely find permanency through adoption and would be subject to potential harm if returned to Kimberly's custody. Although the court did not provide a detailed analysis as to its best-interest finding, it did note under the grounds section that MC wanted to be adopted by her foster parents, as indicated by her testimony, and that she wanted no further contact with her mother. Kimberly filed her timely notice of appeal on May 1, and this appeal followed.

II. *Standard of Review and Applicable Law*

In *Millican v. Arkansas Department of Human Services*, we reiterated our standard of review and two-part analysis in TPR cases:

> This court reviews termination-of-parental-rights cases de novo. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses.

> To terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. The circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exist. Proof of only one statutory ground is sufficient to terminate parental rights. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the

child. The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.

2025 Ark. App. 175, at 10, 709 S.W.3d 871, 878 (quoting *Barnoskie v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 324, at 4–5, 690 S.W.3d 128, 131).

The burden of proof in TPR cases is clear and convincing evidence, which requires a "degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established." *Ring v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 146, at 5, 620 S.W.3d 551, 555. Notably, the TPR statute does not require clear and convincing evidence of each of these factors; rather, it is the best-interest finding, itself, that must be supported by clear and convincing evidence. *E.g.*, *Holdcraft v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 151, at 10, 573 S.W.3d 555, 561. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Goforth v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 233, at 24, 666 S.W.3d 138, 153.

III. *Discussion*

A. Statutory Grounds

In the TPR petition, DHS argued three statutory grounds for TPR and DHS's authority to consent to adoption and permanent alternate placement of MC without parental consent or notice:

A. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* [(Supp. 2023)] - That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

B. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(b)* - That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home of the noncustodial parent for twelve (12) months, and despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that prevented the child from safely being placed in the parent's home, the condition has not been remedied by the parent.

C. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* - That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the parents is contrary to the juveniles' health, safety, or welfare and that, despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parents' circumstances that prevent the placement of the juveniles in the custody of the parent.

After considering the evidence, the court found by clear and convincing evidence that the evidence proved the argued grounds listed as points B and C above (listed as A and B in the TPR order) supported the termination of Kimberly's parental rights to MC as well as the following aggravated-circumstances ground listed as C in the TPR order:

12

Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)* - The parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to: (3)(A) Have subjected any juvenile to aggravated circumstances. (i) A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification; or (B) "Aggravated circumstances" means: a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification.

Although Kimberly does not articulate an argument related to the specific statutory grounds pled by DHS and relied on by the court, we hold that sufficient evidence supports at least one statutory ground for the termination of Kimberly's parental rights to MC. Specifically, there was sufficient evidence to terminate Kimberly's parental rights under the "subsequent factors" and "aggravated circumstances" grounds. Although there was sufficient evidence to support TPR on the basis of both grounds, only one ground is necessary for this court to affirm the TPR. *E.g.*, *Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, at 7, 587 S.W.3d 231, 235. A circuit court may terminate parental rights on the subsequent-factors ground if it determines

> [t]hat other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2023).

Additionally, "a parent's lack of compliance with the case plan and court orders, including a failure to submit to drug screens and testing positive for drugs, supports a grant

13

of termination of parental rights under the 'subsequent-other-factors' ground." *Furnish v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 511, at 6, 529 S.W.3d 684, 688. Notably, this ground only requires DHS to "offer . . . appropriate family services." Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*; *see also Brown v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 104, at 15–16, 542 S.W.3d 899, 907 (finding that DHS is only required to offer—not necessarily provide—appropriate family services).

Here, MC was never placed in Kimberly's custody, and the circuit court repeatedly found that DHS had made reasonable efforts by offering services. Kimberly did not appeal any of these reasonable-efforts findings. At the time of removal, the court noted there was a no-contact order between MC and Kimberly that prevented MC's placement with her. Kimberly was never found to be in compliance with the case plan and court orders, and the circuit court found that it did not know if Kimberly was receptive to services at the permanency-planning hearing on January 7, 2025.

At the beginning of the case, Kimberly tested positive for methamphetamine. She was admitted to "The Addiction Services Program" on June 25, 2024, and attended at least ten group sessions and five individual sessions between June 2024 and January 2025. Despite these services, Kimberly tested positive for methamphetamine on five occasions at Western Arkansas Counseling and Guidance Center, with the latest positive drug screen occurring on January 14, 2025. *See Davis v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 815, at 11, 370 S.W.3d 283, 288 (holding that continued drug use shows an indifference to remedying the problem under the subsequent-factors ground). In January 2025, the circuit court found that

14

Kimberly had not complied with more than twenty attempts to schedule drug screens, and at the time of the TPR hearing, this number reached about forty. *See Furnish*, 2017 Ark. App. 511, at 6, 529 S.W.3d at 688 (holding that a failure to submit to drug screens and testing positive for drugs supports TPR under the subsequent-factors ground). In fact, DHS's report states that "discussion of possible inpatient treatment is needed due to multiple positive inconsistent drug screens." *See Jones v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 299, at 8, 578 S.W.3d 312, 317–18 (holding that failure to benefit from the services provided demonstrates little likelihood that further services will result in a successful reunification).

By the time of the TPR hearing, MC was one month away from turning sixteen. She testified that the last time she lived with her mother, whom she referred to as "Kim," she was seven, nearly nine years prior. She further testified that she did not want to live with her mother, did not feel safe with her mother, and wanted to stay with and be adopted by the people with whom she was placed—despite pressure from parent counsel to get her to change her mind or say she might regret the decision later. MC acknowledged that there was a time when she wanted to live with her mother, but her wishes had changed due to her mother's decision to continue her relationship with Zac, who Kimberly said had proposed, and because Kimberly had tested positive for methamphetamine. MC participated in family counseling sessions and visits that she did not want to attend. After being in DHS's custody for nineteen months and out of her mother's custody for nearly nine years, it was clear that there was little likelihood of reunification within a reasonable period of time as viewed from MC's perspective.

Despite Kimberly's challenges to the specific findings of the circuit court, we hold that sufficient evidence supports the termination of Kimberly's parental rights on the statutory grounds pled in the TPR petition and found by the circuit court, and any remaining arguments are requests to reweigh the evidence on appeal. *See Millican*, 2025 Ark. App. 175, at 16, 709 S.W.3d at 881.

### B. Best-Interest Finding

We further hold that sufficient evidence supports the circuit court's best-interest finding. A circuit court determines whether TPR is in a juvenile's best interest by considering the likelihood that the juvenile will be adopted and the potential harm to the juvenile if there is continued contact with the parent. *E.g.*, *McNeer v. Ark. Dep't of Hum. Servs.*, 2017 Ark App. 512, at 5, 529 S.W.3d 269, 272. These two factors are not essential elements of proof in a TPR case; thus, neither factor need be established by clear and convincing evidence. *Id.* at 6–7, 529 S.W.3d at 272–73. Notably, Kimberly fails to challenge the circuit court's findings regarding either adoptability or potential harm, and we are therefore not required to address these findings. *See, e.g.*, *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, at 8, 587 S.W.3d 604, 609 (because Easter did not challenge the adoptability finding, the court addressed only the potential-harm prong of the best-interest finding).

We disagree with Kimberly's argument that the circuit court's specific findings regarding the supporting statutory grounds and the best-interest analysis were the same. In paragraph eight of the TPR order, the circuit court states:

The Court also finds that the evidence proves the termination of parental rights is in the best interest of the juvenile. In making this finding, the circuit court considered all relevant factors, including the likelihood that the juvenile would be adopted if the parental rights were terminated, and the potential harm, specifically addressing the effect on the health and safety of the juvenile, that could be caused by returning the juvenile to the parent, Kimberly Brahler Barnes.

    A.  As to the juvenile's adoptability, the Court finds that the juvenile is adoptable.

    B.  As to potential harm, the Court finds that the juvenile would be subjected to potential harm if parental rights are not terminated.

The record, including testimony from both MC and Anderson, supports the adoptability prong of the best-interest finding by the circuit court, and the evidence supporting the statutory grounds also supports the potential-harm prong of the best-interest finding. Kimberly develops no further argument regarding potential harm or adoptability; thus, the best-interest determination should be affirmed. *See Benedict v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 395, 409, 242 S.W.3d 395, 316–17 (2006) (holding that appellant's failure to elaborate on a specific argument results in the abandonment of that argument on appeal).

Because there was ample proof in this case on both the statutory grounds for TPR and the best interest of MC, we cannot say the circuit court clearly erred in terminating Kimberly's parental rights. Accordingly, we affirm.

Affirmed.

VIRDEN and HARRISON, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.