

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-17-40

| | |
|---|---|
| NATASHA MICHELLE FURNISH<br>APPELLANT | Opinion Delivered  October 4, 2017 |
| V. | APPEAL FROM THE CRAIGHEAD<br>COUNTY CIRCUIT COURT,<br>WESTERN DISTRICT<br>[NO. 16JJV-15-410] |
| ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES and MINOR<br>CHILDREN | HONORABLE CINDY THYER,<br>JUDGE |
| APPELLEES | AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Appellant Natasha Furnish appeals a Craighead County Circuit Court order terminating her parental rights to three of her children, B.M., A.M., and C.M.[1]  More specifically, she challenges both the trial court's findings of statutory grounds and its best-interest determination.  We affirm.

### I.  *Facts and Procedural History*

The Department of Human Services (DHS) exercised a seventy-two-hour hold on R.M., B.M., A.M., and C.M. on November 10, 2015, at the direction of the Cleburne County Circuit Court at a Family in Need of Services (FINS) hearing.  The court directed

---

[1]One of her children, R.M., was initially part of the dependency–neglect proceedings but turned eighteen prior to termination; therefore, Furnish's rights were not terminated to that child.  Another child, M.M., was born during the pendency of the proceedings and is the subject of a separate dependency–neglect action.

the hold after Furnish had tested positive for amphetamines, methamphetamine, and benzodiazepine. Although the hold was taken in Cleburne County, DHS filed its dependency-neglect petition in Craighead County where Furnish was a resident.

The children were subsequently adjudicated dependent-neglected on December 11, 2015, based on parental unfitness due to Furnish's drug usage.[2] The court ordered Furnish to remain drug free, to submit to random drug screens, and to submit to a drug-and-alcohol assessment and follow the recommendations thereof. She was further ordered to participate in and complete parenting classes; obtain and maintain clean, safe, and stable housing with working utilities; obtain and maintain stable income or employment; and to provide DHS with a budget indicating sufficient income or resources to meet the needs of the family.

At a review hearing in May 2016, the court continued the goal of the case as reunification, finding that Furnish had only partially complied with the case plan. Specifically, the court found that she had not participated in parenting classes, remained drug free, obtained appropriate housing, obtained stable employment, or prepared or submitted a budget. The court also noted that Furnish had missed two drug-and-alcohol-assessment appointments as well as her psychological evaluation. The court ordered her to attend inpatient-drug treatment.

---

[2]The court also found that Max McKinney, the noncustodial parent, had contributed to the dependency-neglect. McKinney is the biological father of R.M., B.M., A.M., and M.M. He is not the biological father of C.M., although the court ultimately found him to be in loco parentis to C.M. McKinney, who was caring for A.M. and C.M. at the time of the 72-hour hold, also tested positive for illegal substances. His rights were not terminated by the order on appeal; thus, he is not a party to this appeal.

SLIP OPINION

A second review hearing was held on July 27, 2016. The court again found that Furnish was not cooperating or complying with the case plan, continuing the same failures from the last review hearing: she still had not participated in parenting classes, obtained appropriate housing or stable employment, or prepared a budget. With regard to sobriety, the court was unable to determine if she had remained drug free because she had not submitted to random drug testing. The court noted that Furnish was admitted to a 120-day inpatient-drug-rehabilitation program, but she left of her own volition after completing only twelve days.

On September 9, 2016, less than one year from the date of removal, DHS filed a petition to terminate Furnish's parental rights to B.M., A.M., and C.M., alleging the subsequent-other-factors ground for termination. DHS alleged that Furnish had failed to complete her parenting classes; did not have stable employment; had not completed a budget indicating sufficient income; had sporadic and tardy visitation; had not submitted to random drug screens since July 2016; had left inpatient-drug rehabilitation before its completion; and had recently tested positive for meth and opiates. In regard to the recent positive tests, DHS alleged that Furnish had given birth to another child, M.M., who tested positive for opiates at birth.

The court held a termination hearing on October 11, 2016. After the hearing, the trial court entered an order terminating Furnish's parental rights to the three children. The court found that DHS had proved by clear and convincing evidence the subsequent-other-factors ground for termination. The court then held that termination was in the best interest of the children, finding that the children are adoptable and that there was potential harm to the

3

SLIP OPINION

children if returned to Furnish's custody. Furnish appeals the trial court's order terminating her parental rights, challenging the court's findings on both statutory grounds and best interest.

## II. *Standard of Review*

The rights of natural parents are not to be passed over lightly. The termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Fox v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 666, 448 S.W.3d 735. As a result, there is a heavy burden placed on the party seeking to terminate the relationship. *Id.* In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Repl. 2015). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).

The appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Dade v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left



with a definite and firm conviction that a mistake has been made. *Id*. In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id*.

### III. *Statutory Grounds*

The court in this case terminated Furnish's parental rights based on the subsequent-other-factors ground. The subsequent-other-factors ground states that parental rights may be terminated when

> other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

Here, the trial court based its statutory-ground determination specifically on Furnish's failure to comply with the case plan; her failure to timely and consistently attend visitation with her children; and her failure to remain drug free or obtain treatment for her drug addiction despite her pregnancy, which resulted in her child having been born with drugs in his system. The record, as evidenced below, supports this conclusion.

From the outset, the court ordered Furnish to comply with the case plan. We have consistently held that a lack of compliance with the case plan and court orders supported termination under the subsequent-other-factors ground. *See Cotton v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 455, at 11, 422 S.W.3d 130, 138. Throughout the proceedings, the court repeatedly found Furnish noncompliant with the directives of completing parenting

classes,[3] having stable employment, and completing a budget. DHS also offered proof that Furnish had difficulty attending visitations, including failing to attend without notifying the department in advance of her absence, and that she had not visited with the children since entering rehabilitation on September 22, 2016. Furnish explained her sporadic visitation with the children, claiming that she had difficulty contacting her family services worker and that there were times the children were not available due to sickness or vacation. She stated that she was late to visits because she had to rely on others for transportation since she did not have a driver's license. However, the court was not obligated to accepted her explanations and was free to assess the credibility of the evidence. *See Smith v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 368, at 12, 523 S.W.3d 920, ___. Thus, the trial court did not clearly err in its findings concerning compliance with the case plan and visitation.

Additionally, the court found Furnish's failure to remain drug free or obtain drug treatment constituted a subsequent other factor. In this regard, we note that Furnish's drug usage was the cause of the removal. We have previously held that the reason for the initial removal cannot constitute grounds for termination as a subsequent other factor. *See Jones v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 615, at 6, 508 S.W.3d 897, 900. However, we have also held that a parent's lack of compliance with the case plan and court orders, including a failure to submit to drug screens and testing positive for drugs, supports a grant of termination of parental rights under the "subsequent–other–factors" ground. *Cotton, supra.*

---

[3]Furnish admitted that she had not completed parenting classes but did report having recently taken two parenting classes.

6

SLIP OPINION

In the instant case, the court ordered Furnish to submit to random drug screens from the outset. Furnish failed several drug screens at the beginning of the case; later, DHS was unable to verify her drug usage (or lack thereof) because Furnish failed to submit to drug screens as ordered. DHS also raised serious questions concerning the legitimacy of Furnish's compliance with drug screens because at one point there was an allegation by B.M. that Furnish was using B.M.'s urine to test negative.[4] Perhaps, most importantly, seven months into this dependency-neglect action, Furnish gave birth to a child that tested positive for opiates at the time of delivery. Furnish admitted using drugs during the pendency of the case and during her pregnancy with M.M. However, she testified that she could not understand why she had tested positive for methamphetamine after M.M.'s birth, but M.M. had not.

Additionally, Furnish was ordered to submit to a drug-and-alcohol assessment. She initially missed two appointments for the drug-and-alcohol assessment as well as an appointment for her psychological assessment. She eventually completed the drug-and-alcohol assessment in July 2016—approximately seven months into the dependency-neglect proceedings, but she still had not completed a psychological evaluation as of the date of the termination hearing. Furnish admitted that she missed two drug evaluations but alleged both were honest mistakes because of misunderstandings.

Furnish was ordered to attend and complete inpatient-drug treatment. She failed to complete her first stint in inpatient-drug rehabilitation, leaving voluntarily prior to completion. However, at the time of the termination hearing, Furnish had enrolled in a six-month drug-rehabilitation program. She stated that she was set to complete the program in

---

[4]Furnish adamantly denied using B.M.'s urine to pass her drug screens.

March 2017 but that the program would allow her to graduate after 120 days and to stay on the property and work to get her children back. Additionally, Furnish reported that she recently had been attending faith-based substance-abuse counseling.

Based on the foregoing, the court had before it ample evidence to support its statutory-ground determination. Furnish's failure to follow the case plan and her demonstrated lack of motivation to resolve her substance-abuse issues until after the termination petition had been filed demonstrate a clear indifference to remedying the circumstances preventing the placement of the children in her custody. While the court considered Furnish's failure to remain drug free or obtain treatment for her drug addiction in its analysis, it did not solely rely on her continued drug usage to support its conclusion and therefore did not err in doing so.

To the extent that Furnish claims the trial court erred in failing to consider her recent progress; her argument is misplaced. In support of her argument, she cites *Prows v. Arkansas Department of Health & Human Services*, 102 Ark. App. 205, 283 S.W.3d 637 (2008). In *Prows*, we held that a circuit court erred as a matter of law when it refused to consider or weigh evidence about a parent's recent improvements in a termination–of–parental–rights case. There, the circuit court stated from the bench that it was required to terminate a parent's rights if a child was not able to go home with the parent immediately after the hearing. We said that the termination statute requires the circuit court to consider a parent's compliance during the entire dependency–neglect case and the evidence presented at the termination hearing in deciding whether termination is in the child's best interest. Ark. Code Ann. § 9-27-341(a)(4)(B). Here, however, in its bench ruling, the trial court acknowledged that Furnish had entered the drug-rehabilitation program but found that her progress was too little, too

8

late. Thus, the trial court clearly considered and weighed Furnish's compliance throughout the entire case and did not reject her last-minute efforts out of hand. Because the court considered and weighed everything and excluded nothing, there is no reversible error under *Prows*.

IV. *Best Interest*

Furnish next challenges the trial court's best-interest finding, arguing that there was insufficient evidence of adoptability and potential harm.

A. Adoptability

Furnish argues that the trial court erred in its best-interest determination because there was insufficient proof that B.M. or C.M. would be adopted. She contends that the only evidence of adoptability presented at the hearing came from the testimony of Janice Birt,[5] who testified that she believed the children are adoptable because every child is adoptable if someone advocated for the child. This is not entirely true.

However, before we address the quantum of evidence introduced on the issue of adoptability at the termination hearing, we must first consider the statutory framework concerning adoptability and our caselaw on this matter. A trial court may terminate a parent's rights only if it finds by clear and convincing evidence that it is in the best interest of the juvenile. The court determines whether termination is in the juvenile's best interest by considering two factors: (1) the potential harm caused by continuing contact with the parent

---

[5]We note that the trial court erroneously identified Tina Green as the caseworker who testified regarding adoptability and potential harm instead of Janice Birt. Given our de novo review of the record, such an error is harmless.

and (2) the likelihood that the juvenile will be adopted if parental rights are terminated. Ark. Code Ann. § 9-27-341(b)(3)(A).

Arkansas Code Annotated section 9-27-341(b)(3)(A)(i) expressly states that the court's best-interest analysis must include "consideration" of the "likelihood" that the juvenile will be adopted if the termination petition is granted. The statute does not, however, mandate that the trial court make a specific finding that the children are adoptable nor must the court find the children are "likely" to be adopted. The statute only mandates the "consideration" of the likelihood of adoptability.

We have held that adoptability is "*but one factor* that is considered when making a best-interest determination." *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, at 6, 385 S.W.3d 285, 288 (emphasis in original) (citing *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005)). To that end, we have held that adoptability "is not an essential element in a termination case." *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, at 7, 389 S.W.3d 1, 4; *Singleton v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 455, at 6, 468 S.W.3d 809, 813 (noting that adoptability is not an essential element of proof). We have also stated that the factor of adoptability need not be proved by clear and convincing evidence. *Smith*, 2017 Ark. App. 368, at 8, 523 S.W.3d at ___. Rather, it is the "best interest" finding that must be supported by clear and convincing evidence. *Salazar v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 218, at 14, 518 S.W.3d 713, 722. With these standards in mind, we now consider the evidence concerning the factor of adoptability before the trial court.

SLIP OPINION

Janice Birt, a foster-care supervisor and Craighead County DCFS worker, testified that B.M., A.M., and C.M. are all adoptable. She reported that B.M. was currently in a group facility. She did express some concern regarding the adoptability of B.M.—B.M. had been quite traumatized and was further frustrated with her parents' noncompliance, resulting in disruptive behavior in foster care. Nonetheless, she stated that she believes that every child is adoptable and that she would just have to "go out there and advocate for them." She informed the court that A.M.'s foster family had expressed an interest in adopting her. C.M. was in another foster family, but her family had not yet been asked whether they were interested in adopting her. Birt further testified that it would not be safe to place the children back in Furnish's care at that time because of her unresolved drug issues. Brenda Keller also testified regarding a home study that had been performed on Max McKinney's sister in North Dakota who had expressed an interest in all three children being placed with her. At the time of the termination hearing, the Interstate Compact on the Placement of Children (ICPC) had been completed, but it had not yet been determined whether the home study had been approved or disapproved.

In the instant appeal, Furnish argues that there was insufficient evidence of the adoptability of these particular children introduced at the termination hearing. In making this argument, Furnish relies on our decision in *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227. That case is distinguishable, however. In *Grant*, an adoption specialist testified that the child was adoptable because "all children are adoptable." We reversed the trial court because its order did not consider the age, health, or well-being

11

of the child; given the difficulties that DHS had experienced in placing the child within the foster system, we concluded that there was a "dearth of evidence" of adoptability.

Here, Birt did not simply rely on her statement that she believed all children are adoptable. She testified that she did not believe that A.M. or C.M. had any issues that would slow an adoption. She testified that A.M.'s foster family had expressed some interest in adopting her but that they had not yet explored adoption with C.M.'s foster family. B.M., however, was in a group facility after having been removed from her foster family, and Birt admitted she had some concerns about her potential for adoption given the trauma she had suffered. There was also some evidence presented that a paternal aunt was interested in having all three children placed with her. Thus, there was more evidence presented for the court's consideration than just the caseworker's general belief as to the adoptability of "all" children. She spoke specifically about her belief as to the adoptability of each individual child and discussed the potential barriers, or lack thereof, to adoption for each child. We have previously held that the testimony of a caseworker concerning adoptability may be sufficient evidence of adoptability and that the testimony of an adoption specialist is not required under the statute. *Duckery v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 358, at 6; *Fortenberry v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 352. We have also held that neither the statute nor caselaw requires a specific quantum of evidence in the consideration of the likelihood of adoptability. *See Renfro*, *supra*. Likewise, we have explained that DHS is not required to provide the names of specific adoptive parents for the children or even provide evidence that it has identified such persons at the termination hearing. *Canada v. Ark. Dep't of Human* Servs., 2017 Ark. App. 476, at 5; *Singleton*, 2015 Ark. App. 455, at 6, 468 S.W.3d at 813. Thus, we

 

cannot conclude, on the record before us, that the trial court erred in its adoptability-factor consideration.

## B.  Potential Harm

Finally, Furnish challenges the trial court's potential-harm determination, contending the evidence of potential harm was lacking because the court did not allow her a full year in which to overcome her drug addiction and reunify with her children.  While she acknowledges the children's need for permanency, she argues that there was no need for expedited termination given the fact that McKinney's rights had yet to be terminated and given the fact there was a potential relative placement for the children that would allow the children to be placed together.

The court's potential-harm analysis was not clearly erroneous.  In considering potential harm caused by returning the child to the parent, the trial court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918. Potential harm must be viewed in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *Martin v. State*, 2017 Ark. 115, 515 S.W.3d 599.  Here, Furnish's continued drug use itself is sufficient to support the trial court's finding of potential harm.  Caselaw is clear that a parent's continuing use of illegal drugs poses a risk of harm to the children if returned to that parent. *Howell v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 154, at 6, 517 S.W.3d 431, 435.

Moreover, a court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Harbin v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 715, at 3, 451 S.W.3d 231, 233.

Affirmed.

GRUBER, C.J., and BROWN, J., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.