Cite as 2023 Ark. App. 355

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-23-112

| | | |
|---|---|---|
| SKEETER SWANSON | | Opinion Delivered August 30, 2023 |
| | APPELLANT | APPEAL FROM THE LOGAN COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 42PJV-21-7] |
| V. | | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE TERRY SULLIVAN, JUDGE |
| | APPELLEES | AFFIRMED |

**RITA W. GRUBER, Judge**

Appellant Skeeter Swanson appeals from the Logan County Circuit Court order terminating her parental rights to two minor children—MC1 (born in April 2017) and MC2 (born in February 2019).[1] On appeal, Swanson argues that there is insufficient evidence to support both the statutory grounds for termination and the finding that termination is in the children's best interest. We affirm.

## I. *Background*

On April 15, 2021, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect alleging the children were dependent-neglected due to parental unfitness, inadequate supervision, and neglect. The

---

[1]The circuit court also terminated the parental rights of the children's father, Milton Brown; however, he is not a party to the appeal.

affidavit in support set out DHS's previous history with Swanson dating back to 2018. A protective-services case was opened after a true finding for inadequate supervision because Swanson had tested positive for methamphetamine in September 2020. When a family-service worker (FSW) went to Swanson's home on April 12, 2021, to complete a home study and a random drug screen, Swanson was screaming and acting erratically. She became increasingly agitated, told the FSW to "just take" the children, and refused a drug screen. Swanson had a bruise on her arm, which she said Milton Brown had caused during a fight. Brown has a history of domestic violence. The children were removed for safety concerns due to Swanson's erratic behavior and expressed desire for DHS to take the children.

The circuit court entered an order for emergency custody on April 15, followed by a probable-cause order on June 1. The court found that the conditions that caused removal continued and necessitated that the children remain in DHS custody. On July 29, the circuit court adjudicated the children dependent-neglected on the basis of parental unfitness due to the parental drug use, domestic violence in the home, and inadequate housing. The order stated that there was domestic violence in the home and Brown had a history of criminal activity, which included threatening and harassing behavior. A goal of reunification was set.

In an October 20 review order, the court found that Swanson was in partial compliance with the case plan and had made progress toward the goal of the case. The order provided that Swanson was moving to a new home, which DHS viewed and deemed appropriate; had obtained a job at Sonic; and was receiving disability payments. She initially did well in counseling but then began to miss appointments and last attended on June 10.

She saw a nurse practitioner at Western Arkansas Counseling and Guidance Center (WACGC) on June 18 for her medication management. She had requested inpatient drug treatment, which DHS arranged, but appeared to be under the influence when she was transported by DHS to Gateway on August 2. Gateway placed her in detox, and Swanson left after a week. Swanson tested positive for methamphetamine during the review period. She watched the video *The Clock is Ticking* and started both parenting classes and counseling. Swanson was discharged from WACGC on September 2 due to missed appointments, but she was allowed to return in October. The FSW received a call from WACGC on October 12 stating that Swanson was rude to the workers and displayed inappropriate behavior. Because Swanson was angry, they recommended sixteen to eighteen weeks of "co-occurring treatment." Although she had missed some visits, Swanson was appropriate during visitation with the children, who had a strong bond with her. She was ordered to complete a drug screen on the day of the review hearing.

In a second review order entered on January 26, 2022, the court found that Swanson had only minimally complied with the case plan and court orders and was not benefiting from services. The court found that the children's health and safety could not be protected if returned to the parents due to safety concerns, which included parental drug use and "the domestic violence and relationship between the parents." The court found that Swanson refused to complete a drug screen on the day of the October 2021 review hearing. The order provided that Swanson had tested positive for amphetamine, methamphetamine, 7-Aminoclonazepam norhydrocodone, and THC. As to visitation, Swanson missed some visits,

3

did not stay the entire time when she did attend, and was frustrated and yelled at the children when they did not listen. The order stated that the parents have a history of domestic violence and had been together since the last hearing. The court ordered Swanson to attend and complete inpatient therapy at Gateway or another appropriate facility and found that it was "crucial."

A permanency-planning order was entered on April 16, which continued the goal of reunification. The order provided that DHS had discretion with visitation up to and including trial home placement with Swanson. The court found that Swanson was beginning to comply with the case plan. She had completed parenting classes and inpatient treatment and had an appropriate home and transportation. The court found that it was imperative that Swanson complete the outpatient program at Gateway.

A fifteen-month review hearing set for July 20 was continued to August 17. The review order filed September 14 changed the goal of the case to adoption. Because the parents had expressed that they wanted to be together, the court ordered them to attend domestic-violence counseling if they chose to stay together. The court found Swanson in partial compliance with the case plan and orders of the court, noting that her compliance was inconsistent. Specifically, the court found that Swanson relapsed and tested positive for methamphetamine after attending inpatient treatment; missed three of eight group counseling sessions; missed one of six individual-counseling sessions; and attended two medication-management appointments. The court further found that she had tested positive four out of eight times since the last review hearing. On April 19, she was positive for

amphetamine, methamphetamine, and THC, and she was positive for THC on April 26, May 2, and May 9.

On October 12, DHS petitioned to terminate Swanson's parental rights. DHS alleged failure to remedy; failure to provide significant support or maintain meaningful contact; subsequent factors; and aggravated circumstances. The court held a termination hearing on November 15.

Pamela Feemster, the FSW supervisor and primary caseworker, testified that the children had been removed for inadequate supervision and parental drug use in April 2021. She said that Swanson had obtained "some sobriety" but had not maintained sobriety throughout the case. Swanson had started an outpatient program but was continuing to test positive and then completed an inpatient program at Gateway, after which she was referred to follow up with an outpatient program. Swanson again was testing positive and was referred back to the outpatient program. Feemster testified that the random drug screens that DHS was able to obtain were negative but that Swanson had recently tested positive for illicit substances in the past month. The issues with Swanson had been maintaining sobriety and being truthful about her relationship with Brown.

Feemster testified that the concerns about Swanson's volatile relationship with Brown had been brought up many times, including in court. She said the domestic violence in the home had been observed by the children. Although Swanson had been adamant since day one that she is not continuing a relationship with Brown, Feemster had seen Brown's car at the home every morning she drove by on her way to work. When Feemster questioned

Swanson, she stated that Brown parks his car at her house and walks home and that she was borrowing Brown's car. Although the parents had recently begun couples counseling, they had missed their appointment on November 8, and Swanson filed for an order of protection, reporting that Brown had broken into her home and threatened to kill her.

Feemster spoke with Swanson after she filed for the order of protection and asked if she was going to go through with it since she has a history of filing and not showing up for court. Feemster testified that the children could not safely be returned to Swanson that day because Swanson again tested positive for methamphetamine and the concerns of domestic violence in the home. Feemster testified that DHS recommended termination of Swanson's parental rights and that the children are adoptable.

As to potential harm, Feemster stated that the children were at risk of being exposed to the domestic violence and the continuing unstable home life. Feemster did not think that continuation of services would result in successful reunification because Swanson would not be truthful about her relationship with Brown or her participation in the case. Feemster realized that relapse is common with addiction but said the children had been out of the home for nineteen months, needed permanency, and did not deserve the constant uncertainty of not knowing where they will live. Feemster said that Swanson began unsupervised visits in June, which DHS had to stop in September due to Brown being at a visit, even though Swanson had been told he could not be present. When Swanson went back to supervised visitation, Swanson attended the first one and canceled the second one. DHS stopped the third visit after forty-five minutes because Swanson would not stop talking

about the case in front of the children, including repeatedly telling MC1 he would be home by Halloween. Feemster testified that Swanson's compliance throughout the case had been inconsistent. Although Swanson worked the services at times, she did not show she was benefiting from them but did just enough "to try to keep going."

On cross-examination, Feemster testified that the order of protection filed by Swanson did not state that Brown lived in the home and asked that he be barred from the home. Feemster said that Swanson had been diagnosed with bipolar-1 disorder, PTSD, and amphetamine substance-abuse disorder and had received counseling and medication management through the WACGC. With respect to the drug screens, Feemster noted a November 11 refusal to submit to a drug test because Swanson was unable to produce a sample during the two-hour visit with the children. Prior to that, the last drug screen had been July 20. Feemster stated there were other attempted random drug screens when DHS went to Swanson's home, but she did not answer the door. Feemster had personally stopped at Swanson's home three times.

On cross-examination by the attorney ad litem, Feemster explained that she received Swanson's records from a recent hospital visit, which indicated a positive drug screen. Feemster also testified that in her conversation with Swanson about filing for the order of protection, Swanson indicated the incident with Brown had occurred recently. She discussed Swanson's relationship with Brown at that time, but Swanson denied having a relationship. Upon questioning by the court, Feemster said she last saw Brown's car at Swanson's home two weeks ago. She spoke with Swanson, who told her that she did not have to worry about

Brown being at the home because the landlord had banned him from the property for taking items from the front yard. The order of protection was filed after this conversation with Swanson.

Milton Brown testified that his relationship with Swanson ended "months ago." He said that his truck had been "broke down" for a month in his mother's yard but that he would drop it off when he went to work so Swanson could use it. Brown said that Swanson had filed for one or two orders of protection before the current one. As to the current one, he denied breaking into her house and said that Swanson had asked him to clean up shingles in the yard. He was later told by the landlord to return the shingles because the job was not done. Brown denied seeing the children during one of Swanson's unsupervised visits and said that Feemster's testimony was incorrect. When questioned by the court about the order of protection filed by Swanson, Brown stated that Swanson was depressed and had called him three times since it was filed, but he did not answer. Brown also told the court that Swanson's landlord had not told him he was banned from the property.

Swanson testified that the case opened because of the domestic "stuff" and drug use. She went to the hospital on November 5, and a drug screen revealed amphetamines and a pain medication in her system. Swanson thought the amphetamine was due to a diet medication she was prescribed and admitted taking a hydrocodone without having a prescription, explaining that she was in severe pain. When asked whether the drug screen was positive for methamphetamine, she said, "I guess it did. I don't know. I mean, I don't know the difference in meth and amphetamine[.]" Swanson denied having used

methamphetamine "in months." When asked when she was last in a relationship with Brown, Swanson said it had been "a long time" but said they have had a friendship. She said they were trying "to get along and help each other the best [they] could for once." In reference to their expressed desire at the last hearing to be together, Swanson acknowledged that it had "crossed their minds," but it never happened.

Swanson testified that the last time Brown was at her house was about a week before the termination hearing when he broke the window, which caused her to file the order of protection. Prior to that incident, he had been at her house when he brought a four-wheeler to swap for his car. Swanson explained that the children wanted to take a ride with their dad. Although she knew she should not let the children be with him, she went along with it because she has "had to tell them no for so long." She testified that she did not see anything wrong with letting them ride down the road for five minutes even though she knew it was against the rules. Swanson lost her unsupervised visits as a result.

On cross-examination, Swanson said she went to the hospital because of painful blisters on her feet. It was at this time that she took hydrocodone. Swanson stated that she had prescriptions for the diet pill Adipex, Trintellix or Abilify as an antidepressant or antipsychotic, and clonazepam for anxiety. She denied that the FSW came to her house in October because she is always home since her car is broken down, adding that the FSW does not even return her calls. Swanson denied having only gone to one family-counseling session and claimed she went to three. She did not go to the last one because the no-contact order was in place. Swanson said she goes to individual counseling once a month and keeps her

medicines regulated by going every three months to have them redone. Swanson denied telling MC1 he would be home by Halloween but said things would be different by next Halloween. Swanson spoke about a supervised visit that was stopped by a caseworker who thought she was talking about the case with MC1. Swanson said she was just answering MC1's questions, which included why they no longer had home visits and the Halloween issue. When asked why she did not think termination was in her children's best interest, Swanson said because her kids love her and want her as bad as she wants them. She said she has done the best she could and that the children were healthy, fed, and loved.

When questioned by the attorney ad litem, Swanson admitted that MC1 had seen Brown attack her once. She initially denied ever having filed for an order of protection but later said she filed one previously. When asked about the current request for an order of protection stating that Brown choked her, threw her on the ground, busted the window on her front door, and threatened to kill her, she explained that all of the allegations did not happen at the same time. She filed for an order of protection after Brown busted through the glass on her door because she refused to open it and told him to go away. Swanson said he did not threaten her that day and denied calling him after filing for an order of protection. She agreed that their relationship had been an issue at every previous hearing but said she was "seeing it clearer" and it took her this long to realize where she had been "messing up."

The court asked Swanson about the August 2022 review hearing where she and Brown expressed a desire to be together and what had changed. She said that they were going to give it a shot, but it did not work out. She realized that her relationship with Brown was

one of the reasons the children were removed and was going to follow through with the order of protection. When the court stated that there has not been any progress in the past nineteen months, Swanson said she did not know why. When asked what progress had been made, Swanson said she was "doing better mentally." As to her issues with drugs, she said, "Well, that was prescription stuff . . . I'm always going to be manic. I'm always going to fight that. But you know if I fall, I've got to get up . . . I can't linger in it, and I cannot do drugs and have the kids. I realize that. I'm going to have to fight this the rest of my life."

Swanson's attorney recalled Feemster as a witness, who again stated that the children have a strong bond with their mother. On cross-examination, Feemster said that she still recommended termination despite this strong bond. She said that the bond does not override the safety factors that are in the home that the children would be subjected to daily. She reiterated that almost twenty months into the case, the children are no closer to going home than they were the day they were taken into custody. She said it is not fair for the children to linger in foster care while Swanson decides whether to end her relationship with Brown, noting that the domestic violence in the home occurred as recently as the week before the hearing.

The attorney ad litem, Amber Briner, recommended termination given the length of the case and the testimony at the termination hearing.

On November 29, the court entered an order terminating Swanson's parental rights based on failure to remedy, failure to provide significant material support or to maintain meaningful contact, subsequent-factors, and aggravated circumstances. The court further

found it was in the best interest of the children to terminate Swanson's parental rights. This appeal followed.

## II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Houseman v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 227, 491 S.W.3d 153. Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Id.* The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the child will be adopted and of the potential harm caused by returning custody of the child to the parent. Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2021); *Houseman*, *supra.*

The burden of proof is clear and convincing evidence, which is the degree of proof that will produce in the finder of fact a firm conviction regarding the allegation sought to be established. *Houseman*, *supra.* The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In resolving the clearly erroneous question, the reviewing court defers to the circuit court because of its superior opportunity to observe the parties and to judge the credibility of witnesses. *Brumley v. Ark. Dep't of Hum. Servs.*, 2015 Ark. 356.

## III. *Statutory Grounds*

12

Swanson first contends that there is insufficient evidence to support the grounds for termination, which included failure to remedy, subsequent factors, and aggravated circumstances. She consolidates her sufficiency argument, stating that she remedied the conditions that caused removal, corrected the subsequent factors, and that there were no additional services necessary to reunify her with her child. In regard to her drug use, Swanson states that she had not tested positive in months and completed her outpatient treatment after her relapse. As for the domestic violence, she contends that she did not resume a relationship with Brown and filed for an order of protection, which she intended to pursue. She argues that she completed the services to correct those two issues and suggests that her single lapse of judgment in letting the children ride on the four-wheeler with Brown should not result in termination of her parental rights.[2]

Proof of only one statutory ground is sufficient to terminate parental rights. *Corley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 397, at 4–5, 556 S.W.3d 538, 541–42. A circuit court may terminate parental rights on the basis of the aggravated-circumstances ground if there is little likelihood that further services will result in successful reunification. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*. A finding of aggravated circumstances does not require DHS to prove that meaningful services toward reunification were provided. *Miller v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 249, 666 S.W.3d 879. However, there must be more than a mere prediction or expectation on the part of the circuit court that services

---

[2]Swanson attempts to cite a case in support of her argument referencing "Mason v. Ark." but fails to include any citation.

will not result in successful reunification. *Yarborough v. Ark. Dep't of Hum. Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006).

Here, the children were adjudicated dependent-neglected based on parental unfitness due to parental drug use and domestic violence in the home. Despite nineteen months of receiving appropriate services, Swanson was not ready to take custody of the children. Feemster testified that she did not think a continuation of services would result in a successful reunification. DHS provided services to assist Swanson with her addiction, including inpatient treatment and both individual and group outpatient counseling. Despite these services, Swanson relapsed and tested positive four times in April and May 2022. After the relapse, Swanson participated in an outpatient program, only to test positive for methamphetamine just before the termination hearing. Although she denied having used methamphetamine in months, she admitted taking hydrocodone without a prescription. In addition, there was testimony that Feemster went to Swanson's home at least three times between July 2022 and the termination hearing to obtain random drug screens, but Swanson was not home. Swanson was unable to submit a urine sample during her two-hour visitation with the children the week before the termination hearing.

In addition to the drug use, domestic violence continued to be an issue in the home. Feemster testified that Swanson refused to admit continuing a relationship with Brown. After the fifteen-month review hearing on August 17, the court entered an order September 14, 2022, which provided, "The parents have stated they want to stay together. If they choose to remain together, they shall attend domestic violence counseling." Feemster testified that

the parents began couples counseling shortly before the termination hearing, noting that it had been recommended since "day one." They attended one session in October and missed a session on November 8. Swanson filed for an order of protection on November 9. Swanson testified that she did not go to the counseling session on November 9 because of the no-contact order in place after she filed for the order of protection. She explained that she filed for the order of protection after the alleged incident that occurred about a week before the termination hearing in which Brown broke the glass on her front door when she would not let him inside the home. There was testimony that Swanson had filed for orders of protection in the past but had not followed through. Brown denied breaking into her home or breaking any property, adding that Swanson had called him several times since she filed for the order of protection. Although Swanson testified that she did not resume a relationship with Brown and intended on pursuing the order, the court was not required to believe her self-serving testimony.

In addition, Swanson obtained unsupervised visits in June 2022 with instructions that Brown was to have no contact with the children. Even though she testified that she knew Brown was not to have contact with the children during the visitation, she allowed him to do so because the children wanted to ride on the four-wheeler with him and she "had told them no for so long." This incident caused Swanson to lose unsupervised visits.

Swanson's statutory-grounds argument is a request for this court to reweigh the evidence. It is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. *Newman v. Ark. Dep't of Hum. Servs.*, 2016 Ark.

App. 207, 489 S.W.3d 186. Given these circumstances, there was sufficient evidence for the court to find there was little likelihood that further services to Swanson would result in a successful reunification. Because DHS had to prove only one statutory ground, we do not address the other grounds. *Hollinger v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 458, 529 S.W.3d 242.

## IV. *Best-Interest Finding*

Swanson argues that the circuit court erred in finding that termination was in the children's best interest. In making a best-interest determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential harm to the child if custody is returned to a parent. *Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604.

On appeal, Swanson does not challenge the adoptability finding, so we address only the potential-harm prong of the circuit court's best-interest finding. In considering potential harm caused by returning a child to the parent, the circuit court is not required to find that actual harm would result. *Middleton v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 97, 572 S.W.3d 410. Potential harm must be viewed in broad terms, including the harm the child suffers from the lack of stability in a permanent home. *Id.* We have held that continued drug use demonstrates potential harm sufficient to support a best-interest finding in a termination-of-parental-rights case. *Tillman v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 119. Moreover, a court may consider past behavior as a predictor of likely potential harm should

16

the child be returned to the parent's care and custody. *Furnish v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 511, 529 S.W.3d 684.

In addition to stating that she adopts her arguments as to grounds, Swanson also contends that termination is not in the children's best interest because the children are bonded with her and the visits go well. Although she cites no authority for her argument, termination of parental rights will not be reversed on the basis of a parent's bond with the child. *See, e.g., Hickman v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 457, 636 S.W.3d 815. She states that she completed the services and corrected both her drug problem and the domestic-violence relationship. Swanson's arguments are simply an attempt to have us assess credibility and reweigh the evidence on appeal, which this court will not do. *Newman, supra.*

As discussed above, Swanson continued to test positive for drugs nineteen months into this case. A domestic-violence petition was pending at the time of the termination hearing, and Swanson continued to be in a relationship with Brown despite the court's continuing concerns. Evidence of a parent's continued drug use or failure to comply with court orders constitutes sufficient evidence of potential harm. *Johnson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 313, 603 S.W.3d 630. In light of the evidence, we cannot say there is clear error in the circuit court's finding of potential harm.

Accordingly, we affirm the circuit court's termination of parental rights.

Affirmed.

ABRAMSON and BROWN, JJ., agree.

*Dusti Standridge*, for appellant.

17

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.