Cite as 2026 Ark. App. 237

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-25-612

| | |
|---|---|
| KRISTIN JOHNS | Opinion Delivered April 15, 2026 |
| APPELLANT | |
| | APPEAL FROM THE VAN BUREN COUNTY CIRCUIT COURT |
| V. | [NO. 71JV-24-7] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE SUSAN WEAVER, JUDGE |
| APPELLEES | |
| | AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Kristin Johns appeals the order of the Van Buren County Circuit Court terminating her parental rights to her daughter, Minor Child (MC), born on February 16, 2024.[1] Appellant argues that the circuit court erred in terminating her parental rights on the statutory grounds. She also argues that the circuit court erred by finding that termination of her parental rights was in MC's best interest. We affirm.

The Arkansas Department of Human Services (DHS) received a hotline call on February 16, 2024, alleging that appellant and MC tested positive for marijuana and amphetamines. DHS performed a drug test on appellant at the hospital before appellant

---

[1]MC's father, Michael Quarrles, voluntarily relinquished his parental rights to MC and is not a party to this appeal.

was discharged. Appellant tested positive for methamphetamine, amphetamines, opioids, and marijuana. She admitted that she had used methamphetamine three days before giving birth. However, she contended that before then, she had been clean since December 11, 2023. Appellant informed DHS that she had worked out a plan whereby she and MC would live with MC's paternal grandmother. DHS conducted a home visit at the grandmother's home on February 17, and although the home was found to be appropriate, the grandmother also tested positive for marijuana and methamphetamine. The grandmother admitted using marijuana but denied using methamphetamine. DHS also discovered that in October 2023, she was convicted of felony drug possession. MC was removed from appellant's custody on February 17 because of parental unfitness due to drug use, Garrett's Law, homelessness, appellant's extensive history with DHS (dating back to 2016) with a pattern of substance abuse, and overall instability. DHS filed a petition for dependency-neglect and emergency custody along with a supporting affidavit on February 20, 2024, outlining the above facts. The circuit court entered an ex parte order for emergency custody that same day. A probable-cause order was filed on February 29; it noted that appellant had stipulated that there was probable cause for DHS to take custody of MC and for MC to remain in DHS's custody. The order stated the following:

> [I]t is alleged the mother has delivered her fifth child, [MC], and the mother tested positive for Amphetamines and THC at time of delivery. The mother has had four other juveniles removed from her care and custody due to allegations of parental unfitness relating to illegal substance abuse, specifically methamphetamines. The mother is alleged to have forgone receiving any prenatal care during this pregnancy. The mother is alleged to be without stable housing and has no place to safely provide care or supervision necessary for a newborn, specifically a drug free environment with

2

an appropriate sober caretaker. The Department has further concerns for the juvenile's health and safety due to these allegations of unstable housing and parental unfitness relating to substance abuse despite four prior juveniles being removed from her care and custody and her knowing the safety risks and past consequences of her choices. The Department is, therefore, deemed to have made reasonable efforts to prevent or eliminate the need for removing the juvenile from the juvenile's home.

Appellant was granted four hours of weekly supervised visitation with MC. Appellant was ordered to comply with the case plan and court orders, cooperate with DHS and all service providers, and notify DHS within forty-eight hours of any change in her address or telephone number. MC was adjudicated dependent-neglected in an order filed on March 28. Appellant stipulated that MC was dependent-neglected as a result of parental unfitness due to appellant's substance abuse and causing MC to be born with illegal substances—methamphetamine, amphetamines, and marijuana—in MC's system. Appellant received the same orders as were in the probable-cause order. The goal of the case was subsequently set as reunification or placement with a fit and appropriate parent.

A review hearing took place on May 8. In the order filed on May 30, the circuit court found that appellant was partially compliant, but she had moved since the last court hearing and had not provided DHS with her new address even though DHS had requested it. And due to this move, DHS had been unable to complete random drug screens or home visits or have appellant participate in the SafeCare program for the past month. Appellant did not have a job, but she stated that she was attending online college classes. In addition to prior orders, appellant was ordered to allow DHS access to her home, remain drug-free, submit to random screens, and continue in any counseling services as recommended by the provider.

3

The goal remained the same. In the September 9 review order following the July 10 hearing, the circuit court found that appellant was not in compliance with the case plan and orders of the court. She still had not provided DHS with a residential address, and she still did not have a job. Prior orders of the circuit court and the case goal remained in effect. The circuit court found appellant noncompliant following the September 4 hearing. According to the order filed on September 13, appellant still had not provided DHS with her address, she had moved four times since the last hearing, and she informed the circuit court she would be going somewhere new to stay beginning that night. She was able to give an address, but she only knew the lady who lived there as "Grandma." DHS had been unable to complete random drug screens, home visits, or the SafeCare program. She still did not have a job but stated that she was taking online classes for teaching English as a second language. She had also missed visits with MC. She was ordered to notify DHS within twenty-four hours of any change in address or telephone number and submit to hair-follicle testing for substance abuse within seven days, and she was given ten days to provide DHS proof of her online-class participation. All other orders and the case goal remained the same. Appellant was also found noncompliant following the November 6 review hearing. In the December 9 order, the circuit court noted that appellant was currently incarcerated in the Searcy County Detention Center after being arrested following the last hearing. The hair-follicle test ordered in September was positive for methamphetamine, amphetamines, and marijuana. Random drug screens at the detention center had been negative. The court orders and case goal remained the same.

4

A permanency-planning hearing took place on January 8, 2025. In the order entered on April 2, the circuit court found that appellant was in compliance with the case plan and orders of the court. She was granted at least eight hours of weekly supervised visitation with MC. Prior orders of the circuit court and the case goal remained the same.

A review hearing took place on February 5. In the amended review order filed on February 12, the circuit court found that appellant was partially compliant with the case plan and orders of the court. Appellant was ordered to submit to hair-follicle testing within seven days.

A fifteen-month review hearing took place on April 2. In the May 1 order, the circuit court found that the goal of the case should be changed to adoption because appellant had not made substantial measurable progress toward the case plan goal of reunification. The court found the following:

> The Court finds [appellant's] testimony today not credible. She has not been in compliance with the case plan for most of the case. She recently moved out of the home in which she was living with her husband Matthew Johns who has a history of drug use and was recently found to be using his sister's prescription medication. She then moved in with Ruben Watts who tested positive for THC and has not been a part of the case plan or involved with the juvenile. She is working at the Searcy County Recycling Center but has been told that her job may not continue to be offered to which she has no other job prospect at this time. She is paying off her criminal fines by working at the recycling center. The Department's caseworker testified that she has been doing better emotionally and cooperating with the Department. She has a support group with her biological father and stepmom. She is starting back with Harbor House outpatient substance abuse and individual counseling with Housley Counseling. She has been doing her eight-hour visits per week, continuing to produce drug-free urine screens and keeping a positive attitude.

The attorney ad litem filed a petition to terminate appellant's parental rights on May 4. The petition alleged several grounds for termination: (1) twelve-months' failure to remedy; (2) subsequent other factors; and (3) failure to provide significant material support.

The termination hearing took place on June 4. Jimmy Carter of the Arkansas Department of Community Correction testified that appellant had been assigned to his caseload since November 18, 2024, after being convicted of several charges in Searcy County, including third-degree domestic battery, forgery, breaking and entering, possession of a controlled substance with intent to deliver, and failure to appear. He stated that appellant is currently serving seventy-two months' supervised probation and a ten-year suspended imposition of sentence (SIS) for the charges. He said that appellant was required to complete community service and pay her fines and that she had only the June payment left. He testified that appellant completed her community service at the Searcy County Recycle Center. He also stated that appellant has to maintain negative drug screens and that she has been clean on the two drug screens administered. He testified that although appellant has completed her community service, she has continued doing it to help Searcy County.

On cross-examination by the ad litem, Carter stated that any community service performed by appellant after April 3 is considered volunteer work; since April 3, appellant had the ability to get regular employment; appellant had a misdemeanor arrest for possession of drug paraphernalia on November 20, 2024; and appellant did not inform him of her failed drug test with DHS during her supervision. He stated that this was something she should have reported to him. Carter stated that appellant was also required to obtain

employment as part of her supervision, but during her last visit on May 8, 2025, she reported that she was unemployed.

Upon questioning by the circuit court, Carter acknowledged that appellant's drug screens were not random because they were performed during a scheduled visit.

Kimberly Duncan, appellant's caseworker, testified that appellant's case opened on February 16, 2024, and that she has been the primary caseworker for less than a month. However, she stated that she was familiar with the case before becoming the primary caseworker. She said that MC has remained in foster case since she was removed from appellant's custody when she was one day old. Duncan testified that appellant did not have stable housing when MC was removed. She testified about the history of the case, including all the pertinent hearings and subsequent findings made by the circuit court. She admitted that appellant has not had stable employment during this case but said that appellant had filled out an application for Subway on May 30 and had a possible interview lined up. She stated that appellant last tested positive for illegal drugs in January 2025. She testified that appellant had moved a "couple of times" during this case. She stated that when appellant got out of jail in October 2024, she moved back in with her husband, Matt Johns, but she subsequently moved out because Johns tested positive for drugs. Appellant then moved in with Rubin Watts, who tested positive for THC on April 2, 2025, at the last court date. She said appellant had made slightly substantial measurable progress toward her goals. Duncan stated that appellant did not have her own home or stable income. She also said that appellant has been drug-free since January. She stated that MC has not been placed with

7

appellant since being removed. She testified that appellant was offered unsupervised visitation, but she did not want to do it because she did not have stable housing. She said that DHS has not been able to check her current home because no one was home when DHS attempted a visit. She stated that there were five failed random drug-testing attempts in April, but DHS was able to perform two in May at the office. Duncan stated that MC is placed with a sibling in the foster home she is in. She testified that DHS had concerns about appellant's inconsistency with stability and housing. She stated that the money appellant made with the Searcy County Recycle Center went toward her fines and that appellant did not receive any direct income.

On cross-examination, Duncan testified that DHS did not have a problem with appellant's income going toward her fines because in DHS's view, by doing this, appellant was not going back to jail. She said that appellant was offered unsupervised visitation in May 2024 and that she is not aware of any other offer. She stated that appellant actually had three clean drug screens in May. She said that she has been unable to visit appellant's current residence because appellant and Watts are working during the day. She stated that her court report indicates that appellant had been "doing better emotionally and getting along with the Department[,]" which has not always been the case. Duncan admitted that this constituted improvement on appellant's part. She also stated that appellant's negative drug screens for about six months was "significant compliance." Duncan stated that appellant had created a support group with her father and stepmother. She said that appellant had also been participating with Harbor House via Zoom and is currently in compliance with the

program. Duncan admitted that DHS wanted to give appellant more time, and it was not ready to terminate appellant's parental rights. Duncan agreed that appellant had taken steps to remedy the issues that caused MC's removal.

Upon questioning by the circuit court, Duncan testified that appellant's last hair-follicle test was on January 7, 2025, and it was positive for THC. She said that the random drug tests were done when she had appellant come to the office within forty-five minutes and take a test. Duncan opined that appellant had made significant progress "towards some of the stuff that she's done" to cause DHS to believe that her parental rights should not be terminated.

Tammy Fox, DHS supervisor for Van Buren and Searcy Counties, testified that she has supervised this case from the beginning. She stated that appellant has not been compliant for most of the case and that DHS's concerns about returning MC to appellant's custody are appellant's lack of stability, employment, transparency, and honesty. She admitted that since January, appellant had been "much kinder" and had taken "constructive criticism . . . so much better." She said that after Johns tested positive for drugs, appellant said she believed he was taking his sister's pills. When asked why she had not reported it, appellant responded that she believed the case would end that next month, and MC would be returned to her. Fox stated that she believed appellant's compliance was based on an understanding that she would no longer have to be involved with DHS. She said that when Watts tested positive for THC, appellant told her they did not know that he was going to have to submit to a drug screen. She said that DHS wanted appellant to have stable

9

employment to prove that she could financially support a child, and DHS was under the impression that appellant was going to continue to work after her fines were paid and receive $11 an hour. She testified that to her knowledge, appellant had been unemployed throughout the entire case. She said that appellant lives in Watts's home, and there is no proof that appellant can financially support MC. She stated that the longest time appellant had lived in one place since the case opened was when she lived with Johns from October 2024 to March 2025. She explained that they had a meeting with the "higher-ups" who determined that appellant should be given more time due to the change in her attitude and negative drug screens. But before that meeting, DHS believed appellant's parental rights should be terminated so that MC could be freed up for adoption. Fox stated that DHS is not prepared to return MC to appellant and that they learned on MC's birthday that appellant was not willing to drop everything for MC when she refused the two hours DHS was willing to give her with MC. She said that she has concerns about appellant's decision-making as evidenced by her change in relationships; her dishonesty; her instability; and her refusal to allow DHS full access into her living environment. Fox testified that a family service worker was allowed into appellant's residence about two weeks before the hearing, and Watts's father's things were still in the room and that there was nothing for a baby in there. She opined that the reason for MC's removal had not been remedied because appellant still lacked stability. She stated that she would have liked to have seen more consistent random drug screens before she would be comfortable saying that appellant's drug issue had been resolved. She said that even though appellant is not currently using drugs,

she continues to be around people who are. She stated that she did not believe that permanency could be achieved within a reasonable amount of time even if DHS continued to work with appellant. Fox stated that there was harm in returning MC to appellant due to too many unknowns and appellant's instability. She opined that MC is adoptable and that her foster parents may wish to adopt, but even if they did not, there are no barriers, and MC is highly adoptable.

On cross-examination, Fox testified that appellant is living with people who have the type of lifestyle she is trying to get away from, which could lead her to make the same choices she has made in the past.

Upon questioning by the circuit court, Fox stated that appellant had two separate incarcerations during this case. She was arrested in September and released in October; she was then re-arrested a short time after her release. She clarified that appellant declined visitation with MC in February 2025. She acknowledged that the Subway application was the first application DHS has received since this case started. She said that there have been ongoing conversations about the importance of appellant's obtaining employment. She stated that appellant started counseling again on May 1, and she had completed counseling in September 2024. She said that DHS requested that appellant go back to counseling following her release from jail and that it was included in appellant's case plan.

The ad litem asked the circuit court to grant its petition to terminate appellant's parental rights to MC. Appellant's counsel asked the circuit court to deny the petition. DHS contended that Fox's testimony was full, thorough, and accurate "as to where the

Department believes this case stands today and what they believe is in the best interest of this child." After going on a tirade about DHS's shortcomings, the circuit court found that the ad litem had met her burden and terminated appellant's parental rights on the grounds of twelve months' failure to remedy and subsequent other factors.

The termination order was filed on July 2, 2025. The circuit court found that MC is adoptable and that she would face potential harm if placed back in appellant's custody. Appellant appealed.

Appellant argues that the circuit court erred in terminating her parental rights because the evidence did not support the statutory grounds for termination or that termination was in MC's best interest. Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child.[2] The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the child will be adopted and of the potential harm caused by returning custody of the child to the parent.[3] Statutory grounds and a best-interest finding must be proved by clear and convincing evidence, which is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established.[4] We review termination-of-

---

[2]*Smith v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 470, 610 S.W.3d 161.

[3]*Id.*

[4]*Id.*

parental-rights cases de novo.[5]  The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[6]  A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[7]

The purpose of the termination-of-parental-rights statute is to provide permanency in a child's life in all instances in which the return of the child to the family home is contrary to the child's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[8]  Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[9]  Proof of only one statutory ground is sufficient to terminate parental rights.[10]

---

[5]*Id.*

[6]*Id.*

[7]*Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).

[8]Ark. Code Ann. § 9-27-341(a)(3) (Supp. 2023).

[9]*Shaffer v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 208, 489 S.W.3d 182.

[10]*Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, 634 S.W.3d 527.

One ground relied on by the circuit court in terminating appellant's parental rights was the subsequent-other-factors ground.[11] In finding termination based on this ground, the order stated in pertinent part:

> The Court finds that [appellant] has manifested the incapacity or indifference to remedy the subsequent issues or factors to rehabilitate [her] circumstances that prevent return of [MC] to [appellant's] custody. [Appellant's] inability to financially provide for herself and [MC] and her choice to live with another man while married to someone else does not show stability. The Court finds that there is little likelihood that continued services would result in reunification.

Appellant maintains that this was not enough to support termination based on this ground. She also contends that the circuit court's bias toward DHS influenced its decision to terminate her parental rights. Our de novo standard opens the entire record for review and does not constrain the appellate court to the circuit court's rationale, allowing for review of the record for additional reasons to affirm.[12] Appellant was found to be in compliance only once during the entirety of the case. She also tested positive for THC eleven months into the case, and there was never a time when DHS could implement a truly random drug test. We have held that a parent's lack of compliance with the case plan and court orders,

---

[11]That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate that parent's circumstances that prevent the placement of the juvenile in the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a).

[12]*Millican v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 175, 709 S.W.3d 871.

including testing positive for drugs, supports termination of parental rights under the subsequent-other-factors ground.[13] Appellant began testing negative for drugs sometime after January 2025, she applied for a job at Subway less than a week before the termination hearing, and she returned to counseling a month before the hearing. However, we have held that a circuit court is not required to credit eleventh-hour efforts, and they will not be held to outweigh evidence of prior noncompliance.[14] Appellant also failed to obtain stable housing, employment, or income during this case. This, too, is enough to support the subsequent-other-factors ground.[15] Finally, appellant had two separate drug-related arrests after the filing of the original petition. We hold that there was sufficient evidence to support the termination of appellant's parental rights based on the subsequent-other-factors ground.

Appellant argues that the circuit court erred in finding that it was in MC's best interest to terminate appellant's parental rights. She contends that she made significant progress and that there was no evidence MC would suffer any detriment if returned to appellant. Appellant does not challenge the circuit court's finding that MC is adoptable; therefore, it is waived on appeal.[16] Evidence of potential harm must be viewed in a forward-looking manner and considered in broad terms; however, a circuit court is not required to

---

[13]*See Furnish v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 511, 529 S.W.3d 684.

[14]*See Myers v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 46, 660 S.W.3d 357.

[15]*See Cotton v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 455, 422 S.W.3d 130.

[16]*Black v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 518, 565 S.W.3d 518.

find that actual harm will result or to affirmatively identify a potential harm.[17] Additionally, past behavior may be viewed as a predictor of potential harm.[18] Further, the same evidence relied on to support statutory grounds may be used to support potential harm.[19] Here, appellant had no stability throughout the case, moving four times in a short period of time. She failed to reach the financial stability needed to care for MC, and she relied on others for housing. She was arrested twice and was on supervised probation and an SIS for a number of years. By the time of the hearing, appellant had begun complying; however, this was not enough. Appellant's history with DHS began years before MC was born. In fact, all of appellant's children had been removed due to illegal substance abuse, and appellant did not have custody of any of them. Under these facts, we cannot say that the circuit court's finding that MC would be subjected to potential harm if returned to appellant was clearly erroneous. Accordingly, we affirm.

To the extent that appellant's argument is a request for us to reweigh the evidence in her favor, it is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court.[20]

Affirmed.

---

[17]*Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91.

[18]*Id.*

[19]*Id.*

[20]*Woods v. Ark. Dep't of Hum. Servs.*, 2025 Ark. App. 587, 725 S.W.3d 883.

THYER and WOOD, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Janet Lawrence Blankenship*, attorney ad litem for minor child.